# No. 14-5065

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

---

GENE H. YAMAGATA, REX G. MAUGHAN,
AND RUTH G. MAUGHAN,

Plaintiffs-Appellants

v.

THE UNITED STATES,

Defendant-Appellee

---

ON APPEAL FROM THE JUDGMENT OF THE
UNITED STATES COURT OF FEDERAL CLAIMS
Nos. 1:07-cv-00698-NBF, 1:07-cv-00704-NBF
Judge Nancy B. Firestone

---

BRIEF FOR THE APPELLEE, THE UNITED STATES

---

TAMARA W. ASHFORD
  *Acting Assistant Attorney General*

RICHARD FARBER          (202) 514-2959
ARTHUR T. CATTERALL      (202) 514-2937
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

  *December 18, 2014*

# TABLE OF CONTENTS

**Page**

Table of contents ................................................................. i
Table of authorities .............................................................iv
Statement of related cases ...............................................viii
Glossary .............................................................................ix
Jurisdictional statement ...................................................... x
Statement of the issue.......................................................... 1
Statement of the case ........................................................... 2

    A.    Overview.................................................................... 2

    B.    Legal backdrop:  Entity classification under the Kintner regulations............................................................. 3

    C.    Factual background ................................................. 6

            1.    The Forever Living Products group..................... 6

            2.    Formation and pre-1990 operation of Forever Living Products Japan, Ltd.................... 7

            3.    The 1990 settlement agreement ........................... 9

            4.    The 1992 agreements ......................................... 14

            5.    Japanese tax dispute ......................................... 16

    D.    Taxpayers' U.S. refund claims............................... 17

            1.    Administrative claims........................................ 17

            2.    CFC proceedings ............................................... 19

                 a.    The parties' arguments.............................. 19

                b.    The CFC's opinion...................................... 23

**Page**

Summary of argument ........................................................27

Argument:

I.     Standard of review .......................................................31

II.    The Court of Federal Claims correctly held that Forever
       Living Products Japan, Ltd. was an association taxable as a
       corporation under U.S. tax law during the years at issue ...........31

       A.    FLPJ exhibited the corporate characteristic of
             centralized management.......................................31

             1.    FLPJ was centrally managed by its board of
                   directors....................................................32

             2.    The parenthetical in Treas. Reg. § 301.7701-
                   2(c)(1) does not preclude centralized management
                   during the period in which Yamagata and
                   Maughan were direct shareholders of FLPJ ...............34

             3.    Taxpayers' arguments on appeal are meritless ..........41

                   a.    There is no basis for disregarding taxpayers'
                         S-corporation holding companies as a
                         general matter, let alone for purposes of
                         applying the -2(c)(1) parenthetical ....................41

                   b.    Taxpayers' contention that FLPJ's board of
                         directors did not have exclusive authority to
                         manage FLPJ's affairs is baseless ......................45

       B.    FLPJ exhibited the corporate characteristic of limited
             liability ...............................................................49

             1.    FLPJ's shareholders were not personally liable
                   for the debts of, or claims against, FLPJ....................50

             2.    Taxpayers' arguments on appeal are meritless ..........52

- ii -

**Page**

    C.    FLPJ exhibited the corporate characteristic of free
          transferability of interests ...................................................54

         1.    FLPJ had a modified form of free transferability
               as contemplated in the regulations ............................55

         2.    Taxpayers' arguments on appeal are meritless ..........57

Conclusion ........................................................................................61
Regulatory appendix ........................................................................62
Certificate of service........................................................................75
Certificate of compliance.................................................................76

12208877.1

# TABLE OF AUTHORITIES

**Cases:**                                                          **Page(s)**

*Abbott Labs. v. United States*,
  573 F.3d 1327 (Fed. Cir. 2009)......................................... 31, 40

*Aloe Vera of America, Inc. v. United States*,
  128 F. Supp. 2d 1235 (D. Ariz. 2000) .................................... 6

*Am. Express Co. v. United States*,
  262 F.3d 1376 (Fed. Cir. 2001)....................................... 40-41

*Auer v. Robbins*,
  519 U.S. 452 (1997) ..................................................... 40

*Bailey v. Dart Container Corp. of Mich.*,
  292 F.3d 1360 (Fed. Cir. 2002)............................................ 32

*Broz v. Commissioner*,
  727 F.3d 621 (6th Cir. 2013) ............................................ 44

*Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*,
  400 F.3d 1352 (Fed. Cir. 2005)............................................ 40

*Chapman Glen Ltd. v. Commissioner*,
  140 T.C. 294 (2013) ..................................................... 56

*Crook v. Commissioner*,
  80 T.C. 27 (1983),
  *aff'd*, 747 F.2d 1463 (5th Cir. 1984) ..................................... 44

*Diebold Foundation, Inc. v. Commissioner*,
  736 F.3d 172 (2d Cir. 2013)................................................ 52

*Eleanore Builders, Inc. v. United States*,
  826 F. Supp. 1111 (N.D. Ohio 1993) ..................................... 60

*Glaxo Group Limited v. TorPharm, Inc.*,
  153 F.3d 1366 (Fed. Cir. 1998)............................................ 32

*Kurzner v. United States*,
  413 F.2d 97 (5th Cir. 1969) ............................................. 51

*Madorin v. Commissioner*,
  84 T.C. 667 (1985) ...................................................... 43

*Moline Properties, Inc. v. Commissioner*,
  319 U.S. 436 (1943) ..................................................... 44

*Monsanto Co. v. Bayer Bioscience N.V.*,
  514 F.3d 1229 (Fed. Cir. 2008)............................................ 22

**Cases (cont'd):**                                               **Page(s)**

*Morrissey v. Commissioner,*
  296 U.S. 344 (1935) ............................................................51
*Morton v. United States,*
  98 Fed. Cl. 596 (2011) ....................................................43-44
*Murray v. United States,*
  687 F.2d 386 (Ct. Cl. 1982) ...............................................52
*O'Neill v. United States,*
  410 F.2d 888 (6th Cir. 1969) .............................................51
*Reflectone, Inc. v. Dalton,*
  60 F.3d 1572 (Fed. Cir. 1995)............................................36
*Richlands Med. Ass'n v. Commissioner,*
  60 T.C.M. (CCH) 1572 (1990),
  *aff'd,* 953 F.2d 639 (4th Cir. 1992) .................................35-37
*Sun First Nat'l Bank of Orlando v. United States,*
  607 F.2d 1347 (Ct. Cl. 1979) .............................................43
*United States v. Kintner,*
  216 F.2d 418 (9th Cir. 1954) ...............................................4
*United States v. Woods,*
  134 S. Ct. 557 (2013) .........................................................56
*W & W Fertilizer Corp. v. United States,*
  527 F.2d 621 (Ct. Cl. 1975) ...............................................43
*Yamagata v. United States,*
  114 Fed. Cl. 159 (2014) .......................................................3
*Zuckman v. United States,*
  524 F.2d 729 (Ct. Cl. 1975) ...........................................4, 42

**Statutes:**

Commercial Code of Japan, Art. 260(1).......................................33

Corporation Tax Law of Japan, Art. 132.....................................54

Internal Revenue Code (26 U.S.C):

  § 11   .................................................................................3
  § 183 .............................................................................43-44

12208877.1

**Statutes (cont'd):**                                          **Page(s)**

Internal Revenue Code (26 U.S.C):

§ 183(a) ....................................................................... 43
§ 671 ........................................................................... 43
§ 676(a) ....................................................................... 43
§§ 701-761.................................................................... 3
§§ 1361-1379.................................................................. 3
§ 7701(a)(2) .................................................................. 4
§ 7701(a)(3) .................................................................. 4

## Regulations:

Treas. Reg. (26 C.F.R.) (1996):

§ 301.7701-2........................................................................ 4
§ 301.7701-2(a)(1) ............................................................... 4
§ 301.7701-2(a)(2) ............................................................... 5
§ 301.7701-2(a)(3) ............................................................... 5
§ 301.7701-2(b)(1) ............................................................... 5
§ 301.7701-2(c)..................................................................... 35
§ 301.7701-2(c)(1) ................................................... 20, 23-24, 34
§ 301.7701-2(c)(2) ............................................................... 37
§ 301.7701-2(c)(3) ............................................................ 32-33
§ 301.7701-2(c)(4) ............................................................ 37-39
§ 301.7701-2(d)(1) ........................................................... 5, 50
§ 301.7701-2(e)(1) ........................................................ 6, 54, 58
§ 301.7701-2(e)(2) ................................................... 6, 54, 56, 58

Treas. Reg. (26 C.F.R.) (current):

§ 1.1001-2(c), ex. 5 .......................................................... 43
§ 301.7701-2(b)(8) ............................................................ 7

## Miscellaneous:

G.C.M. 34,407, 1971 WL 28907 (Jan. 22, 1971) ............................ 40

12208877.1

**Miscellaneous (cont'd):** **Page(s)**

Rev. Rul. 71-574, 1971-2 C.B. 432 ................................ 35-36, 38, 40

Rev. Rul. 93-6, 1993-1 C.B. 229 ......................................... 35-36, 38

T.D. 8697, 1997-1 C.B. 215 ............................................................ 45

Winthrop D. Thies, "Professional Service Organizations:
A Comment," 24 Tax L. Rev. 291, 293-294 (1969) ......................... 38

12208877.1

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, counsel for the appellee state that (1) no other appeal in or from the same civil action or proceeding in the lower court has previously been before this Court or any other appellate court; and (2) *Yamagata v. United States* (Fed. Cl. No. 13-512T) (currently stayed) may be affected by this Court's decision in the pending appeal.

12208877.1

# GLOSSARY

ASI – Aloe Sales, Inc.

AVA – Aloe Vera of America, Inc.

CFC – United States Court of Federal Claims

FLPI – Forever Living Products, Inc.

FLPJ – Forever Living Products Japan, Ltd.

I.R.C. – Internal Revenue Code

IRS – Internal Revenue Service

*KK – kabushiki kaisha*

NTA – Japanese National Tax Authority

NTT – Japanese National Tax Tribunal

## JURISDICTIONAL STATEMENT

The Government agrees with the appellants' jurisdictional statement.

12208877.1

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

———————————

No. 14-5065

GENE H. YAMAGATA, REX G. MAUGHAN,
AND RUTH G. MAUGHAN,

Plaintiffs-Appellants

v.

THE UNITED STATES,

Defendant-Appellee

———————————

ON APPEAL FROM THE JUDGMENT OF
THE UNITED STATES COURT OF FEDERAL CLAIMS
Nos. 1:07-cv-00698-NBF, 1:07-cv-00704-NBF
Judge Nancy B. Firestone

———————————

BRIEF FOR THE APPELLEE, THE UNITED STATES

———————————

## STATEMENT OF THE ISSUE

Whether the Court of Federal Claims correctly held that Forever Living Products Japan, Ltd., a Japanese joint-stock company, was an association taxable as a corporation under U.S. tax law during the years at issue.

- 1 -

12208877.1

## STATEMENT OF THE CASE

### A.    Overview

This tax-refund case involves the proper classification, for federal tax purposes, of the Japanese entity Forever Living Products Japan, Ltd. ("FLPJ") from 1991 through 1996.  Appellants Gene H. Yamagata and Rex G. Maughan ("taxpayers") are U.S. citizens who directly or indirectly co-owned FLPJ during those years.  Taxpayers initially treated FLPJ as a corporation – a separate taxable entity – for tax purposes, and they filed their respective 1991-1996 U.S. tax returns on that basis.  They subsequently claimed that those filings were erroneous, and that FLPJ should instead be classified as a partnership – a "pass-through" entity – under the so-called Kintner regulations that governed entity classification at the time.

According to taxpayers, if FLPJ were reclassified as a partnership for the period 1991-1996, they would be entitled to individual tax refunds for those years due to a combination of "additional foreign tax credits[,]…a single level of taxation, and…the tax rate arbitrage

- 2 -

between Japan and the United States." (A1288, A1312.)[1] Based on

that theory, Yamagata claims aggregate refunds of $9,753,274, and the

Maughans claim aggregate refunds of $36,738,362. (A2.) On cross-

motions for summary judgment, the Court of Federal Claims ruled in

favor of the Government, holding that FLPJ was properly classified as a

corporation during the years at issue. *See Yamagata v. United States*,

114 Fed. Cl. 159 (2014).

## B.    Legal backdrop:  Entity classification under the Kintner regulations

As a general matter, corporations are subject to federal income

tax. *See* 26 U.S.C. ("I.R.C." or "Code") § 11; *but see* I.R.C. §§ 1361-1379

(providing pass-through treatment for certain electing "small business

corporations," known as "S" corporations). Partnerships, on the other

hand, are not subject to federal income tax; instead, items of

partnership income, gain, loss, deduction, and credit flow through to the

partners' returns. *See generally* I.R.C. §§ 701-761. As is relevant here,

the term "partnership" generally denotes a multi-owner, unincorporated

---

[1] "A" references are to the Joint Appendix to be filed by the appellants.

- 3 -

organization other than an "association" (the latter term being subsumed within the definition of "corporation").  I.R.C. § 7701(a)(2), (3).  The term "association" is not defined in the Code.

Prior to 1997, the determination whether a domestic unincorporated organization – or an entity organized under the laws of a foreign jurisdiction – should be treated as an association (taxable as a corporation) or as a partnership for federal tax purposes was governed by the so-called Kintner regulations.[2]  *See* 26 C.F.R. ("Treas. Reg.") § 301.7701-2 (1996).[3]  These regulations defined the term "association" as "an organization whose characteristics require it to be classified for purposes of taxation as a corporation rather than as another type of organization such as a partnership or a trust."  Treas. Reg. § 301.7701-2(a)(1).  In determining whether a particular organization should be treated as an association or as a partnership, the relevant characteristics were "centralization of management, continuity of life,

---

[2] So named because they were promulgated in response to *United States v. Kintner*, 216 F.2d 418 (9th Cir. 1954).  *See Zuckman v. United States*, 524 F.2d 729, 733-734 (Ct. Cl. 1975).

[3] Unless otherwise noted, citations to Treas. Reg. § 301.7701-2 are to that section as in effect prior to 1997.

- 4 -

free transferability of interests, and limited liability." Treas. Reg.
§ 301.7701-2(a)(2).  The organization would be treated as an association
(taxable as a corporation) only if it exhibited at least three of those
characteristics.  Treas. Reg. § 301.7701-2(a)(3).

The regulations contained general descriptions of each of the four
relevant corporate characteristics, followed by further elaboration.
Thus, as a general matter, an organization was deemed to have
continuity of life "if the death, insanity, bankruptcy, retirement,
resignation, or expulsion of any member w[ould] not cause a dissolution
of the organization."  Treas. Reg. § 301.7701-2(b)(1).  It was deemed to
have centralized management "if any person (or any group of persons
which d[id] not include all the members) ha[d] continuing exclusive
authority to make the management decisions necessary to the conduct
of the business for which the organization was formed."  Treas. Reg.
§ 301.7701-2(c)(1).  The organization was deemed to have limited
liability "if under local law there [wa]s no member who [wa]s personally
liable for the debts of or claims against the organization."  Treas. Reg.
§ 301.7701-2(d)(1).  And it was deemed to have free transferability of
interests "if each of its members or those members owning substantially

12208877.1

all of the interests in the organization ha[d] the power, without the consent of other members, to substitute for themselves in the same organization a person who [wa]s not a member of the organization." Treas. Reg. § 301.7701-2(e)(1); *see also* Treas. Reg. § 301.7701-2(e)(2) (recognizing a "modified form of free transferability" if each member could "transfer his interest to a person who [wa]s not a member of the organization only after having offered such interest to the other members at its fair market value").

### C.   Factual background

#### 1.   The Forever Living Products group

At all relevant times, appellant Rex Maughan controlled multiple business organizations known collectively as the Forever Living Products group ("FLP Group").  (A1922.)  The FLP Group has been described as

> one of the largest world suppliers of health and beauty products based on the aloe vera plant.  The FLP Group is vertically integrated from plantations that grow aloe, through shipping, processing, manufacturing, marketing and sales.  Several million distributors worldwide are involved in the distribution of the Group's products. …

*Aloe Vera of America, Inc. v. United States*, 128 F. Supp. 2d 1235, 1237 (D. Ariz. 2000).

- 6 -

The FLP Group included Aloe Vera of America, Inc. ("AVA"), the

world's largest grower and processor of aloe plants.  (A1921.)  During

the years at issue, AVA was "engaged in the producing and processing

of aloe vera leaves, the extraction of gel from the leaves, the

stabilization of the gel, the packaging of such stabilized gel for

shipment[,] and the manufacturing of nutritional, cosmetic and health

products utilizing stabilized aloe gel as an ingredient."  (A839.)

### 2.    Formation and pre-1990 operation of Forever Living Products Japan, Ltd.

FLPJ was organized in September 1980 as a Japanese *kabushiki*

*kaisha* (joint-stock company), with Forever Living Products, Inc.

("FLPI") as its sole shareholder.  (A4 & n.8, A1225.)  Of all the Japanese

business forms, the *kabushiki kaisha* ("*KK*") is the most analogous to a

U.S. corporation.[4]  (A1346.)  For instance, as is typically the case with a

U.S. corporation (A1564), managerial authority with respect to a *KK*

resides in its board of directors.  (A1343.)  Moreover, like the

---

[4] Indeed, under current Treasury regulations, a *KK* is treated as a corporation *per se* for U.S. tax purposes.  *See* Treas. Reg. § 301.7701-2(b)(8) (as amended in 1996 effective January 1, 1997).

- 7 -

shareholders of a U.S. corporation, the shareholders of a *KK* are not liable for the *KK*'s debts. (A1344.)

In January 1983, FLPI granted FLPJ the exclusive right to sell FLP Group products in Japan. (A840.) Shortly thereafter, FLPI transferred ownership of FLPJ to Yamagata and Maughan in equal shares. (A1945-1946.) The share certificates issued to Yamagata and Maughan bore a legend providing that "[a]ny assignment of shares of the Company shall require the approval of the Board of Directors." (A4.)

From 1983 through 1989, FLPJ had three directors: Yamagata, Maughan, and Rjay Lloyd, Maughan's longtime friend and confidant. (A5.) During that period, Yamagata and Maughan were "representative" directors, meaning that they also had the authority to act on behalf of FLPJ (similar to corporate officers). (A5.) Aside from Yamagata and Maughan, FLPJ's most senior officer at the time was Rick Toma, who served as FLPJ's administrative manager. (A5.) When he began working for FLPJ in 1984, Toma was under the impression that Yamagata "was wholly entrusted with the operation of the company." (A818.) Accordingly, prior to 1990, he took directions

regarding the management and operation of FLPJ directly from Yamagata, rather than from FLPJ's board of directors. (A5 n.9.)

From 1983 through 1988, FLPJ purchased substantially all of its raw aloe vera gel and other raw materials and products from AVA pursuant to a supply agreement with that company. (A767, A1952.) Both Yamagata and Maughan had entered into agreements with AVA providing for the payment of commissions by AVA to Yamagata and Maughan, respectively, on sales of bulk stabilized aloe vera gel and other products by AVA to FLPJ. (A911.) Those commissions were included in the price that FLPJ paid for shipments of products from AVA. (A1952.)

### 3.    The 1990 settlement agreement

In 1989, unbeknownst to Maughan, FLPJ began purchasing some of its raw materials from Summit Enterprises, a company in which Yamagata held a 65% ownership interest. (A767.) Litigation between the two principals ensued, with the parties ultimately resolving their differences through mediation. (A6-7.) The parties memorialized their agreement in several documents, including a Settlement Agreement dated December 21, 1990. (A7.)

Article 1 of the Settlement Agreement addressed the "[c]orporate [g]overnance of FLPJ." (A841.)  In particular, Article 1.2 provided that, "[t]o the maximum extent allowed by law, all decisions relating to the operation and management of FLPJ shall be vested in and carried out by the Board of Directors." (A842.)  The agreement also increased the number of directors from three to five, with "[t]wo members…elected from among candidates nominated by Maughan[,]…two members… elected from among candidates nominated by Yamagata," and a neutral party serving as the fifth member. (A841.)  The agreement contemplated that Maughan's initial nominees would be himself and Rjay Lloyd; that Yamagata's initial nominees would be himself and Rick Toma; and that the initial fifth director would be Gary Driggs, who had served as one of the mediators. (A8, A843.)  It further contemplated that, at the outset, Maughan would serve as Chairman of the Board, President, and Representative Director, and Yamagata would serve as Vice Chairman of the Board. (A844-845.)

Article 4 of the Settlement Agreement addressed "[s]tock [t]ransfer [r]estrictions." (A854.)  Article 4.2 set forth a right-of-first-refusal procedure in the event either Yamagata or Maughan desired to

- 10 -

sell his FLPJ shares to a third party.  (A9, A854-858.)  Under that procedure, the selling shareholder was required to offer his shares first to the non-selling shareholder by means of a written offer specifying the price and payment terms he was willing to accept for his stock.  (A854-855.)  If the non-selling shareholder failed to accept the offer within 30 days (or, having timely accepted the offer, failed to consummate the sale within the designated closing period), then the selling shareholder was free, for a period of seven months, to sell his shares to any third party on terms no more favorable than those specified in the written offer to the non-selling shareholder.  (A10, A857-858.)  Article 4.5 contemplated that Yamagata's and Maughan's share certificates would bear a legend referencing the Settlement Agreement and stating that the shares were subject to transfer restrictions as set forth in that agreement.  (A859.)

Under Article 6 of the Settlement Agreement, FLPJ "agree[d] to purchase," and Yamagata (on behalf of his successors and assigns) "agree[d] to sell to FLPJ," all of Yamagata's FLPJ shares upon Yamagata's death for $10 million.  (A10, A860-861.)  The agreement provided that Yamagata was free to assign his rights under Article 6 to any third-party purchaser of his shares.  (A10, A863-864.)  Taxpayers

- 11 -

"concede…[that] at the time the parties entered into the Settlement Agreement Japanese law did not allow a [*KK*] to reacquire its own shares." (A49 n.40; *see* A1398.)

At a meeting of the shareholders convened on January 22, 1991, the shareholders formally elected Maughan, Rjay Lloyd, Yamagata, Hiro Nakao, and Gary Driggs as directors of FLPJ.[5] (A11, A919.) As contemplated in the Settlement Agreement, Maughan was designated President, Representative Director, and Chairman of the Board, and Yamagata was designated Vice Chairman of the Board. (A11, A919.) Nakao was designated "Resident Representative Director, with limited responsibilities as delegated to him by Rex G. Maughan, the other representative director." (A919, A11.)

The initial, post-settlement board meeting was held on January 22 and 23, 1991, following the shareholders meeting. (A925, A928.) At that meeting, the Board adopted a number of resolutions to implement the Settlement Agreement. (A12.) Among other things, in order to

---

[5] Rick Toma declined to serve on the Board for personal reasons, and Yamagata nominated Nakao – "part of our team in Japan" – in his stead. (A769, A1948.)

ensure that Yamagata could no longer act with apparent authority (*i.e.*, without board approval) on behalf of FLPJ, the board accepted Yamagata's resignation as a representative director (while recognizing his status as a director and Vice Chairman of the Board).  (A12, A926-927.)  In addition, the Board resolved that Nakao would be "available as resident representative director to sign legally on behalf of the company on any documents required in the ordinary course of business and other items specifically authorized by Mr. Maughan, as Representative Director."  (A930-931.)  The Board further resolved that Rick Toma, as "managing director," would "report directly to Rex Maughan as chairman of the board."  (A931.)[6]

FLPJ's publicly filed Commercial Registry was never amended to reference the right of first refusal contained in Article 4.2 of the Settlement Agreement.  (A2536.)  Moreover, minutes of board meetings held on August 15 and November 21, 1991 reveal that, as of those dates, the FLPJ share certificates had yet to be endorsed with the restrictive legend described in Article 4.5 of the agreement.  (A945, A950, A2537.)

---

[6] Notwithstanding the title, Mr. Toma did not serve on the board of directors.  *See* note 5, *supra*.

- 13 -

There is no evidence in the record that the certificates bore that legend at any time prior to the transfers discussed below.  (A2537.)

### 4. The 1992 agreements

In 1992, a dispute arose regarding the continued board membership of Gary Driggs (the fifth member).  (A14 n.16.)  In response to a letter from Maughan to Toma indicating (A972) that "Gary is no longer on the board" and that no further compensation should be paid to him for periods after June 30, 1992, Yamagata, Nakao, and Driggs sent a letter to Maughan quoting the language from Article 1.2 of the Settlement Agreement regarding corporate governance of FLPJ by the board of directors.  (A973.)  *See* p. 10, *supra*.  The letter asserted that Maughan's "unilateral position dismissing Gary Driggs…is a breach of the [settlement] agreement" and that "[i]t is quite clear that the terms of [director] compensation cannot be changed by an individual board member, but can only be changed after appropriate notice, meeting, and action by a majority."  (A973-974.)  In a subsequent letter to Maughan, Yamagata again quoted Article 1.2 of the Settlement Agreement, noting that "[c]orporate governance by the board was of paramount importance to me and was one of the principal items negotiated into the settlement

- 14 -

agreement." (A975.)  Driggs ultimately resigned on terms approved by the full board.  (A963-964, A967-969.)

Due in part to the Driggs episode, Yamagata and Maughan executed a First Amendment to Settlement Agreement effective September 1, 1992.  (A977.)  The amendment provided that the board would operate with only four members unless and until Yamagata or Maughan proposed to fill the vacant "fifth member" slot, and it provided a procedure for filling that vacancy.  (A978-981.)  It also provided that, in the event of a deadlock of the four-member board, either Yamagata or Maughan could submit the matter at issue to arbitration in lieu of invoking the selection process for a fifth board member.  (A981-983.)

The amendment also reflected Yamagata's and Maughan's agreement to transfer their respective FLPJ shares to wholly-owned corporations. (A983-984).  And it rescinded the buy-back provision of the Settlement Agreement applicable to the Yamagata shares, based on advice of counsel regarding the general prohibition against the acquisition by a *KK* of its own shares.  (A984-985.)

A letter agreement between Yamagata and Maughan dated October 1, 1992 explained that the two principals were forming a new

- 15 -

corporation – Aloe Sales, Inc. ("ASI") – to replace FLPJ as the obligor with regard to the buy-back provision applicable to the Yamagata shares.[7] (A12-13.)  The parties memorialized ASI's obligation in that regard in a Buy-Sell Agreement dated October 13, 1992.  (A1000, A1004-1006.)  The Buy-Sell Agreement also confirmed that the right-of-first-refusal provisions contained in the Settlement Agreement would "survive the transfer of FLPJ stock from Maughan and Yamagata to [their respective wholly-owned corporations,] Maughan Holding, Inc. and Yamagata Holding, Inc."  (A1003, A13-14.)  Finally, in December 1992, the parties entered into an Escrow Agreement with respect to the Yamagata shares to "[e]nsure that…Yamagata Holding's shares of stock of FLP Japan…are [not] transferred in violation of the Buy-Sell Agreement."  (A771, A1018.)

### 5.    Japanese tax dispute

In 1996, the Japanese National Tax Authority ("NTA") and the Internal Revenue Service ("IRS") commenced a simultaneous

---

[7] The letter agreement, which provided that Yamagata and Maughan would own ASI in equal shares, further contemplated that ASI would receive the commissions that AVA had previously paid directly to Yamagata and Maughan.  (A12-13.)

- 16 -

examination of FLPJ, AVA, and Maughan. (A15.) In 1997, the NTA

issued Correction Notices with respect to FLPJ's 1991-1996 tax years.

(A1298.) The Correction Notices recharacterized a portion of FLPJ's

payments to AVA – recorded as deductible cost of goods sold, *see supra*

p. 9 – as nondeductible director bonuses to Yamagata and Maughan,

thereby increasing FLPJ's Japanese taxable income for each of those

years. (A15-16.) FLPJ filed an administrative appeal with the National

Tax Tribunal ("NTT"), which denied the appeal in 2000. (A773, A1299,

A1325.) Ultimately, however, the entire upward adjustment to FLPJ's

Japanese taxable income was eliminated by a transfer pricing

adjustment agreed to by the United States and Japan that had the

effect of recharacterizing a large portion of FLPJ's Japanese-source

income into U.S.-source income of AVA. (A1298-1299, A1325-1326.)

### D.    Taxpayers' U.S. refund claims

#### 1.    Administrative claims

In November 2001, the Maughans filed refund claims with the

IRS for their 1991-1996 tax years, claiming aggregate refunds in the

amount of $30.3 million. (A16, A87-88, A90, A92, A94, A96.) Yamagata

filed similar refund claims in June and July of 2003 with respect to his

- 17 -

1991-1994 and 1996 tax years, claiming aggregate refunds in the amount of $9.75 million.  (A16, A70, A73, A75, A78, A80.)  The claims were based on "a corrected entity classification, that FLPJ should properly be treated as [a]…partnership under applicable law, the Kintner treasury regulations."  (A1288, A1311-1312.)  Specifically, taxpayers argued that FLPJ's entity classification "changed as of January 1, 1991, predicated on two events which were effective on that date":  (1) the execution of the Settlement Agreement, which allegedly "impact[ed]…both the centralized management and the free transferability…issues," and (2) "[t]he factual and legal findings by the NTT" regarding FLPJ's 1991-1996 tax years, which allegedly "impact[ed]…the limited liability…issue."  (A1290, A1316-1317.)  *See* Part B, *supra*.[8]  The claimed refunds allegedly would "result from the additional foreign tax credits available to the U.S. owners of the FLPJ pass-through entity, from a single level of taxation, and from the tax rate arbitrage between Japan and the United States."  (A1288, A1312.)

---

[8] Taxpayers conceded that FLPJ possessed the corporate characteristic of continuity of life.  (A1288, A1312.)

The IRS formally disallowed taxpayers' refund claims on September 29, 2005.  (A16.)

### 2.    CFC proceedings

Yamagata filed suit on his claims in the Court of Federal Claims ("CFC") on September 27, 2007, and the Maughans did so a day later.[9] (A16-17.)  The court consolidated the cases, and the parties filed cross-motions for summary judgment on the entity classification issue.  (A3, A17.)  Given taxpayers' concession of the continuity-of-life issue, *see supra* note 8, the parties limited their arguments to the other three corporate characteristics:  centralized management, limited liability, and free transferability of interests.

### a.    The parties' arguments

The Government filed first, arguing that FLPJ possessed each of the three corporate characteristics at issue.  (Doc. 80.)[10]  The Government began by arguing that, because FLPJ's board of directors

---

[9] The Maughans requested an aggregate refund of $36.7 million in their complaint, as compared to the $30.3 million requested in their administrative claim.

[10] "Doc." references are to documents contained in the original record, as numbered by the Clerk of the Court of Federal Claims.

12208877.1

"had exclusive authority to make the management decisions necessary to conduct business, FLPJ easily met the test for centralization of management." (Doc. 80 at 5; *see id*. at 12-20.) In that regard, the Government argued that the Settlement Agreement actually resulted in *increased* board supervision over FLPJ's business activities. (Doc. 80 at 5; *see id*. at 14-17.) The Government also argued that, notwithstanding the fact that Yamagata and Maughan served on FLPJ's board, the parenthetical in Treas. Reg. § 301.7701-2(c)(1) – which refers to collective management authority by "any group of persons which does not include all the members" – did not defeat centralized management in this case, since that language was aimed at the situation where all of the members participate in the management of the company by virtue of their status as members, rather than by virtue of the fact that all of them happen to belong to the management group in a representative capacity. (Doc. 80 at 17-18.)

The Government then turned to the remaining two characteristics at issue. Regarding limited liability, the Government noted that, "[j]ust like U.S. corporations, Japanese *KK*s are limited-liability entities whose shareholders are not personally liable for corporate debts," and it

- 20 -

refuted taxpayers' "various theories suggesting that" the NTT's disposition of FLPJ's 1991-1996 tax case somehow stripped them of their limited liability as FLPJ shareholders.  (Doc. 80 at 5; *see id*. at 20-32.)  As for free transferability, the Government argued that the various restrictions taxpayers sought to impose on the transferability of FLPJ shares "did not, as plaintiffs suggest, reverse FLPJ's characteristic of free transferability," since those restrictions were either unenforceable under Japanese law or – in light of the regulations' recognition of "modified" free transferability – irrelevant.  (Doc. 80 at 6; *see id*. at 32-40.)

Taxpayers, on the other hand, argued that FLPJ *lacked* each of the three corporate characteristics at issue.  (Doc. 87.)  First, they argued that FLPJ lacked free transferability of interests because their respective ownership interests therein were subject to transfer restrictions "beyond a mere right of first refusal at fair market value." (Doc. 87 at 17.)  While acknowledging that the requirement of board consent (which predated the Settlement Agreement) could be overcome by means of a judicial procedure specifically designed for that purpose, taxpayers maintained that said procedure "did not guarantee that a fair

- 21 -

market value price for the shares would be reached." (Doc. 87 at 23.)
They similarly argued that the right of first refusal under the
Settlement Agreement did not require "that [the shares] be offered at
fair-market-value." (Doc. 87 at 25.) Finally, they argued that the buy-
back provision to which the Yamagata shares were subject destroyed
free transferability with respect to those shares, since their value might
exceed $10 million at Yamagata's death.[11] (Doc. 87 at 27-28.)

As for the other two corporate characteristics at issue, taxpayers
argued that FLPJ lacked limited liability because, "had the NTA been
unable to collect the full amount of [FLPJ's 1991-1996] tax deficiency
from FLPJ, it could have sought to satisfy the unpaid amount from
Maughan and Yamagata personally under the Denial of Transaction
Rule [of Japanese law], to the extent of the profits earned by them from

---

[11] Taxpayers also argued that free transferability was lacking
because "[n]ot all of the attributes of the members' interests c[ould] be
transferred." (Doc. 87 at 18.) Because they did not renew that
argument in their opening brief on appeal, that argument is waived.
*See, e.g., Monsanto Co. v. Bayer Bioscience N.V.*, 514 F.3d 1229, 1240
n.16 (Fed. Cir. 2008). For the same reason, any argument that the
December 1992 Escrow Agreement with respect to the Yamagata shares
has any bearing on the issue of free transferability is waived as well.

- 22 -

the transactions."[12]  (Doc. 87 at 35-36.)  They then argued that FLPJ

lacked centralized management for the following reasons:  "the group of

persons with management authority included all the members of FLPJ"

(*i.e.*, in contravention of the parenthetical language of Treas. Reg.

§ 301.7701-2(c)(1)); "Maughan and Yamagata both controlled the FLPJ's

board"; and "FLPJ's directors did not act in a representative capacity."

(Doc. 87 at 40.)

### b.    The CFC's opinion

In a 55-page opinion, the CFC granted the Government's motion

for summary judgment and denied taxpayers' cross-motion.  (A1-55.)

Specifically, the court held that "because at all relevant times FLPJ

exhibited at least three of the corporate characteristics of centralized

management, limited liability, a modified form of free transferability of

---

[12] Taxpayers also argued that FLPJ lacked limited liability
because Maughan could have been held liable for FLPJ's tax debts
under the "essential assets" theory of Japanese law.  (Doc. 87 at 36-39.)
Because they did not renew that argument in their opening brief on
appeal, that argument is waived.  *See* note 11, *supra*.  For the same
reason, taxpayers' argument that limited liability is lacking based on
the applicability of general "secondary liability" principles as expressed
in Japanese case law (Doc. 87 at 33) is waived as well.

- 23 -

interests, and the conceded characteristic of continuity of life, FLPJ was properly taxed as a corporation." (A20.)

Starting with centralized management, the court found that "the undisputed facts establish that FLPJ was centrally managed by its Board of Directors for the years in question." (A26.) The court concluded, however, that the parenthetical language in Treas. Reg. § 301.7701-2(c)(1) "unambiguously precludes a finding of centralized management in instances when all of a company's shareholders also serve on its board of directors." (A29.) Although the court relied on that regulation in holding that FLPJ lacked centralized management during the period in which taxpayers directly owned their interests in FLPJ, it "decline[d] [their] invitation to extend the parenthetical provision's bar to situations where the [board-serving] 'members' maintain an 'indirect' interest in an organization," as taxpayers did after transferring their interests to their respective holding companies in October 1992. (A31.) Accordingly, the court held that the Government was "entitled to summary judgment on the issue of centralized management after that date." (A31.)

- 24 -

Next, the court held that "FLPJ exhibited limited liability notwithstanding plaintiffs' potential liability [for FLPJ's taxes] under Japan's limited 'denial of transaction' rule." (A32.) The court reasoned that "[i]f the theoretical ability of a [limited-liability entity's] creditor" to seek recovery from an owner of the entity based on an abuse-of-entity theory were "sufficient to eliminate limited liability for the purpose of the Kintner regulations," then very few closely-held entities "could ever be said to exhibit" that corporate characteristic.[13] (A35.)

Finally, the court held that, "even assuming that all of the purported [share transfer] restrictions were fully enforceable under Arizona and Japanese [l]aw,…FLPJ retained a modified form of free transferability of interests during all relevant tax years." (A41 [fn. ref. omitted].) First, the court concluded that the requirement of board consent was "consistent with a modified form of free transferability"

---

[13] Although the court held that taxpayers' similar argument based on the "essential assets" theory of Japanese law was barred under the doctrine of variance (A36-40), it noted that, "[l]ike the 'denial of transaction' rule, the 'essential assets' theory does not meaningfully impair the general and substantial limitation on [*KK*] shareholder liability found in the Japanese Commercial Code." (A40 n.35.) As indicated in note 12, *supra*, taxpayers have waived this argument on appeal.

- 25 -

under the regulations "because the Japanese Commercial Code's judicially-managed sale mechanism" in the event of a board veto "guarantees a sale price that is intended to approximate fair market value." (A46.) Regarding the contractual right of first refusal, "[t]he court d[id] not discern any meaningful difference between the procedures in Article 4 of the Settlement Agreement and the modified form of free transferability described in the Kintner regulations." (A48.) The court also found that the buy-back provision did not violate the fair-market-value principle, reasoning that "[b]ecause Yamagata's beneficial interest would have terminated upon his death, it is the value associated with pre-death transfers – not the lump sum payment upon death – that is relevant for purposes of the free transferability analysis." (A51.)[14]

This appeal followed.

---

[14] The court also rejected taxpayers' arguments described in note 11, *supra*. As explained in that footnote, taxpayers have waived those arguments on appeal.

1220877.1

## SUMMARY OF ARGUMENT

Under the Kintner regulations, foreign entities were treated as corporations for U.S. tax purposes if they exhibited at least three of the following characteristics:  continuity of life, centralized management, limited liability, and free transferability of interests.  Taxpayers concede that FLPJ, a Japanese joint-stock company, exhibited the corporate characteristic of continuity of life during the years at issue (1991-1996).  Accordingly, if FLPJ possessed at least two of the three remaining characteristics, then it was properly treated as a corporation for U.S. tax purposes – just as taxpayers contemporaneously reported on their individual U.S. tax returns.  The Court of Federal Claims correctly held that FLPJ had limited liability and free transferability of interests at all times, thus ensuring its status as a corporation for tax purposes.  The court also correctly held that FLPJ had centralized management, although it erred in limiting that holding to periods after October 1992.

1.    FLPJ had centralized management because, as contemplated in the regulations, its affairs were managed by a group appointed by the members – *i.e.*, a shareholder-elected board of

- 27 -

directors – rather than by the members in their capacity as members.
Although taxpayers claim that their 1990 settlement agreement
somehow diluted the board's management authority, the opposite is
true:  the agreement expressly provided that management authority
would reside in the board to the maximum extent allowed by law.  And
the record confirms that FLPJ was board-managed in practice as well
as in form.

Although the CFC correctly found that FLPJ's board – which
included Yamagata and Maughan – had exclusive management
authority throughout the years at issue, it erred in holding that a
parenthetical in the applicable regulation unambiguously precludes a
finding of centralized management during the period in which
Yamagata and Maughan directly owned their FLPJ shares (*i.e.*, prior to
October 1992).  The surrounding context of the regulation strongly
supports an alternative reading of the parenthetical, one which both the
IRS (in published rulings) and the Tax Court adopted long ago.  By
definition, then, the parenthetical is ambiguous, and the court should
have deferred to the IRS's longstanding interpretation of its own

- 28 -

regulation – an interpretation that dictates a finding of centralized management for the entire period at issue.

2.    FLPJ possessed the corporate characteristic of limited liability because the Japanese statute under which it was organized, similar to domestic corporation statutes, provides that shareholders of a joint-stock company are not liable for claims against the company merely by virtue of their status as shareholders.  In that regard, the CFC correctly held that taxpayers' alleged potential liability relating to adjustments to FLPJ's Japanese taxable income for the years at issue did not affect the limited-liability analysis, since any such liability would derive not from taxpayers' mere status as shareholders, but from their manipulation of FLPJ's dealings with a related party.  Taxpayers' argument to the contrary – that their alleged potential liability arose solely because they benefited from (and not because they orchestrated) the tax-avoidance scheme, and that such potential liability therefore derived from their mere status as shareholders – is a futile exercise in semantics.

3.    FLPJ exhibited the modified form of free transferability of interests contemplated in the regulations because both the contractual

- 29 -

right-of-first-refusal procedure and the judicial procedure available in lieu of board consent ensured that a transferring shareholder would obtain fair market value for his shares.  And, as the CFC correctly found, the buy-back provision to which the Yamagata shares were subject upon Yamagata's death did not restrict the transfer of those shares; rather, it effected a fundamental change in the ownership rights associated with the shares – from outright ownership to a terminable interest with a termination payment.  Nothing prevented the holder of the Yamagata shares from obtaining the fair market value of those modified ownership rights pursuant to either the contractual procedure or the judicial procedure available to the holder.  Thus, taxpayers' focus on the nominal "transfer" upon the termination event (Yamagata's death) is misplaced.

The decision of the Court of Federal Claims is correct and should be affirmed.

12208877.1

# ARGUMENT

## I.    Standard of review

This Court "reviews grants of summary judgment by the Court of Federal Claims *de novo*."  *Abbott Labs. v. United States*, 573 F.3d 1327, 1330 (Fed. Cir. 2009).

## II.    The Court of Federal Claims correctly held that Forever Living Products Japan, Ltd. was an association taxable as a corporation under U.S. tax law during the years at issue

### A.    FLPJ exhibited the corporate characteristic of centralized management

Under the Kintner regulations, an organization was deemed to have centralized management "if any person (or any group of persons which d[id] not include all the members) ha[d] continuing exclusive authority to make the management decisions necessary to the conduct of the business for which the organization was formed," similar to "the directors of a statutory corporation."  Treas. Reg. § 301.7701-2(c)(1). Although the CFC correctly found (A21) that "during all relevant periods, FLPJ's Board of Directors possessed sole authority to make important management decisions on behalf of the company," it erred in concluding (A26) that "this factor alone does not end the court's inquiry" regarding the issue of centralized management.  Specifically, the court

- 31 -

erred in holding that the regulatory parenthetical quoted above

precludes a finding of centralized management for the period during

which Yamagata and Maughan were shareholders (as well as board

members) of FLPJ (*i.e.*, the period preceding the October 1992 transfers

of their FLPJ shares to their respective holding companies).[15]

### 1. FLPJ was centrally managed by its board of directors

The CFC correctly found that "the undisputed facts establish that

FLPJ was centrally managed" and that appellants "failed to put into

dispute any fact to suggest otherwise." (A24.) As the court recognized,

"the critical question to be answered with regard to centralized

management under the Kintner regulations is whether FLPJ's Board of

Directors had 'exclusive authority to make independent business

decisions on behalf of the organization which [did] not require

ratification by the members.'" (A24) (quoting Treas. Reg. § 301.7701-

---

[15] "When a matter comes before an appellate court following a summary judgment, the appellate court is free to adopt a ground advanced by the appellee in seeking summary judgment but not adopted by the trial court." *Glaxo Group Limited v. TorPharm, Inc.*, 153 F.3d 1366, 1371-1372 (Fed. Cir. 1998); *see also Bailey v. Dart Container Corp. of Mich.*, 292 F.3d 1360, 1362 (Fed. Cir. 2002).

2(c)(3)) (alteration in original).  In that regard, Article 260(1) of the

Japanese Commercial Code (as in effect during the years at issue)

provided that a *KK*'s board of directors "'shall decide the administration

of affairs of the company.'"  (A24, A243, A320.)  Moreover, "[a]t no point

during the tax years relevant to this lawsuit did FLPJ's Articles of

Association require shareholder approval for decisions other than

electing and compensating FLPJ's Board of Directors."  (A5.)  This

formal structure was observed in practice as well:  "The record makes

clear that FLPJ's board addressed significant corporate business

management issues such as reviewing leases, approving dividends, and

making marketing decisions," whereas, consistent with the Articles of

Association, "FLPJ's shareholder meetings served primarily to elect

directors and establish director compensation."  (A25.)

Notably, the Settlement Agreement had the effect of *strengthening*

the centralized management of FLPJ by its board of directors, not the

other way around as taxpayers claim.[16]  The agreement expressly

---

[16] Taxpayers undercut their own position in this regard in
asserting (Br. 23) that FLPJ had theretofore "operated as a partnership,
in an informal manner."  That assertion also undercuts taxpayers'

(continued…)

provided that, "[t]o the maximum extent allowed by law, all decisions

relating to the operation and management of FLPJ shall be vested in

and carried out by the Board of Directors."  (A842.)  This provision was

"one of the principal items negotiated into the settlement agreement"

(A975); indeed, the litigation that the agreement settled arose out of

actions taken by Yamagata on behalf of FLPJ without board approval.

And when Maughan, less than 18 months after the implementation of

the Settlement Agreement, instructed FLPJ's administrative manager

(without board approval) to cease compensating Driggs as a director,

three of the directors "successfully resisted" that action by invoking the

corporate governance provision of the agreement.  (A14 n.16.)

> ### 2. The parenthetical in Treas. Reg. § 301.7701-2(c)(1) does not preclude centralized management during the period in which Yamagata and Maughan were direct shareholders of FLPJ

In a parenthetical, Treas. Reg. § 301.7701-2(c)(1) refers to

collective management authority by "any group of persons which does

---

(…continued)
broader premise that, until the implementation of the Settlement
Agreement, FLPJ was properly classified as a corporation for U.S. tax
purposes.  (A1290, A1316.)

- 34 -

not include all the members" (the "-2(c)(1) parenthetical").  Despite the

existence of both administrative and judicial authority to the contrary,

the CFC held that this language "*unambiguously* precludes a finding of

centralized management in instances when all of a company's

shareholders also serve on its board of directors."  (A29 [emphasis

added].)  This aspect of the court's analysis is erroneous.

In a 1971 Revenue Ruling, the IRS held that, "even though all of

[a professional service organization's] members happen to be members

of its board of directors, *i.e.* the management group, at a particular

time, this does not preclude the [organization] from having centralized

management, despite the [-2(c)(1) parenthetical]."  Rev. Rul. 71-574,

1971-2 C.B. 432, 432; *see also* Rev. Rul. 93-6, 1993-1 C.B. 229, 231

(same).  The Tax Court has likewise held that, notwithstanding the

-2(c)(1) parenthetical, "an identity between the owners and directors of

an entity at a particular point in time does not preclude 'centralized

management' within the meaning of section 301.7701-2(c)."  *Richlands*

*Med. Ass'n v. Commissioner*, 60 T.C.M. (CCH) 1572, 1582 (1990), *aff'd*

*on other grounds*, 953 F.2d 639 (4th Cir. 1992).  Although the CFC

acknowledged this authority (A27-28 & nn. 27, 28), it nonetheless

- 35 -

concluded that their holdings could not be reconciled with the plain
language of the -2(c)(1) parenthetical.

The CFC erroneously viewed the language of the -2(c)(1)
parenthetical – "any group of persons which does not include all the
members" – in isolation, rather than in the context of the regulation as
a whole.  *See Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1577-1578 (Fed.
Cir. 1995) (en banc).  That context strongly supports the alternative
interpretation – *viz.*, "any group of persons which does not *necessarily*
include all the members" – underlying the IRS and Tax Court holdings
discussed above.  *See* Rev. Rul. 71-574, 1971-2 C.B. at 433 (noting that
"all members do not have to be directors"); Rev. Rul. 93-6, 1993-1 C.B.
at 231 ("The elected managers…may or may not include all members of
the company."); *Richlands Med. Ass'n*, 60 T.C.M. (CCH) at 1583
(interpreting the parenthetical to mean any group that "is not *required*,
under an organization's governing documents, to include all the
members") (emphasis in original).

Contextual support for this alternative reading of the -2(c)(1)
parenthetical appears in the very next sentence of the regulation:
"Thus, the persons who are vested with such management authority

- 36 -

resemble in powers and functions the directors of a statutory corporation." Treas. Reg. § 301.7701-2(c)(1).  In that regard, we are not aware of any state corporation statute specifying that the board of directors may not include all the shareholders (*i.e.*, in the case of a closely held corporation).  And the very next paragraph of the regulation confirms that "[t]he persons who have such authority may, or may not, be members of the organization," with no caveat regarding the *number* of members in the management group.  Treas. Reg. § 301.7701-2(c)(2).

Moreover, Treas. Reg. § 301.7701-2(c)(4) explains that reserving "management powers in a board of directors…effectively prevents a stockholder…, *simply because he is a stockholder*…, from binding the corporation…by his acts."  [Emphasis added.]  The implication is that the -2(c)(1) parenthetical is aimed at the situation where all of the members participate in the management of the company by virtue of their status as members, rather than in a representative capacity.  *See Richlands Med. Ass'n*, 60 T.C.M. (CCH) at 1584 (noting that the relevant state statute "prohibits individual [members] from binding the [organization]…, and petitioner has failed to convince us that it was *not*

- 37 -

managed by [its] Board of Directors, *acting as such in a representative capacity*") (emphasis added); Rev. Rul. 71-574, 1971-2 C.B. at 432, 432-433 (although the members "elected themselves as the sole members of the board of directors," "the authority to make management decisions is not vested in the entire membership *as such*, but in the board of directors") (emphasis added); Rev. Rul. 93-6, 1993-1 C.B. at 231 ("Although all of *M's* members are elected managers of *M*, *M* nevertheless possesses centralized management, because…authority to make management decisions rests solely with the…members *in their capacity as managers rather than as members*") (emphasis added).[17]

The remainder of Treas. Reg. § 301.7701-2(c)(4) only strengthens that implication. That paragraph makes clear that, "because of the mutual agency relationship between members of a general partnership," pursuant to which "the act of any partner within the

---

[17] One commentator has argued in this context that "while, coincidentally, the sole director of a professional corporation may be the sole stockholder, such director acts not for himself as beneficial owner of the business (as in a partnership), but in a representative capacity on behalf of all stockholders as a class, including future stockholders," since "future stockholders may hold him to account for his errors and omissions." Winthrop D. Thies, "Professional Service Organizations: A Comment," 24 Tax L. Rev. 291, 293-294 (1969).

12208877.1

scope of the partnership business binds all the partners," such an organization "*cannot* achieve" centralized management "*even if the partners agree among themselves that the powers of management shall be exclusively in a selected few*," since such an agreement "will be ineffective as against an outsider who had no notice of it." *Id.* (emphasis added). In other words, due to the combination of mutual agency and apparent authority (*i.e.*, by operation of law), general partnerships are, in effect, managed by a group of persons which *necessarily* includes all the members, such that they do not exhibit centralized management under the IRS's reading of the -2(c)(1) parenthetical. But if that parenthetical simply articulates a mechanical counting rule (as the CFC concluded), then every general partnership with delegated management authority as contemplated in § 301.7701-2(c)(4) would exhibit centralized management under the -2(c)(1) parenthetical, contrary to the *per se* rule of § 301.7701-2(c)(4).

We maintain that the foregoing analysis establishes that the IRS's reading of the -2(c)(1) parenthetical is not only a *permissible* interpretation, but is also the *best* interpretation. This Court need not agree with the latter assessment, however, in order to rule for the

12208877.1

Government on this issue.  That is because, as the CFC recognized, "[i]f

an ambiguity exists,…the agency's interpretation will be accepted if it

fits within the scope of the ambiguity that the regulation contains."

(A29) (citing, *inter alia*, *Auer v. Robbins*, 519 U.S. 452 (1997)).  Indeed,

"an agency's interpretation of its own regulation is entitled to a level of

deference even 'broader than deference to the agency's construction of a

statute, because in the latter case the agency is addressing Congress's

intentions, while in the former it is addressing its own.'"[18] *Abbott Labs.*,

573 F.3d at 1330 (quoting *Cathedral Candle Co. v. U.S. Int'l Trade

Comm'n*, 400 F.3d 1352, 1363-1364 (Fed. Cir. 2005)).  Moreover, "'[i]n

the context of tax cases, the government's reasonable interpretation of

its own regulations and procedures are entitled to particular

deference.'" *Abbott Labs.*, 573 F.3d at 1333 (quoting *Am. Express Co. v.*

---

[18] We note that, before taking the position set forth in Rev. Rul.
71-574, *supra*, the IRS concluded that it was consistent with the
"regulatory history" of the -2(c)(1) parenthetical.  *See* G.C.M. 34,407,
1971 WL 28907, p. 5 (Jan. 22, 1971) (stating that, "[a]lthough the
precise reason for the insertion of the parenthetical language found in
section 301.7701-2(c)(1)…is not expressed in the underlying file,…
indications are that this was done with the intent of changing the
Service's then prevailing position that the corporate criterion of
centralized management was satisfied when management decisions
were made by a majority vote of the entire membership.").

12208877.1

*United States*, 262 F.3d 1376, 1383 (Fed. Cir. 2001)).  Because the IRS's interpretation of the -2(c)(1) parenthetical is, at the very least, a permissible one when the context of the entire regulation is taken into account, judicial deference to that interpretation is appropriate.

### 3.    Taxpayers' arguments on appeal are meritless

Taxpayers take issue with two aspects of the CFC's centralized-management analysis:  (1) the court's conclusion that the -2(c)(1) parenthetical did not preclude centralized management once they transferred their FLPJ interests to their respective holding companies, and (2) its conclusion that FLPJ's board of directors had exclusive management authority.  Neither of taxpayers' arguments in this regard has any merit.

### a.    There is no basis for disregarding taxpayers' S-corporation holding companies as a general matter, let alone for purposes of applying the -2(c)(1) parenthetical

As discussed in the preceding section, the Government disagrees with the CFC's holding that the plain language of the -2(c)(1) parenthetical precludes a finding of centralized management during the period in which taxpayers directly owned their interests in FLPJ.  To its credit, however, the court was consistent in its approach, holding that

- 41 -

the plain language of the parenthetical conversely rendered it inapplicable once taxpayers transferred their FLPJ interests to their respective holding companies in October 1992. Having argued below for a "mechanical[ ]" application of the regulations (A1877), taxpayers now argue (Br. 16) that "[i]n substance, [they] remained the members of FLPJ" after they transferred their interests to their holding companies. In other words, taxpayers embrace the CFC's literalistic approach only when it suits their cause. This Court should reject taxpayers' attempt to have it both ways.

In ruling against taxpayers on this issue, the CFC reasoned (A31) that this Court's predecessor "rejected the notion of indirect or constructive ownership in ruling on the question of centralized management," citing *Zuckman v. United States*, 524 F.2d 729, 739 (Ct. Cl. 1975). Taxpayers' attempt (Br. 13) to distinguish *Zuckman* on the ground that it did not involve S corporations (which generally are treated as flow-through entities for federal income tax purposes) is wholly without merit. Indeed, shortly after deciding *Zuckman*, the Court of Claims refused to treat the settlor of a revocable trust – who, by virtue of the "grantor trust" rules of the Code, was subject to tax on

- 42 -

the trust's income, *see* I.R.C. §§ 671, 676(a) – as the owner of shares of an S corporation he transferred to the trust.  *See W & W Fertilizer Corp. v. United States*, 527 F.2d 621, 627-628 (Ct. Cl. 1975).  Taxpayers cite no authority for the proposition that an S corporation's assets should be treated as constructively owned by its shareholders for tax purposes in general, let alone for purposes of the -2(c)(1) parenthetical.[19]

Taxpayers' reliance on *Morton v. United States*, 98 Fed. Cl. 596 (2011), is misplaced.  *Morton* involved the so-called "hobby loss" rule of I.R.C. § 183, which limits deductions that are attributable to an individual's or S corporation's activities "not engaged in for profit." I.R.C. § 183(a).  The issue in that case was whether an S corporation (RWB) that held title to a private jet could deduct expenses related to the operation of the jet – deductions that would flow through to its shareholder, Morton – where Morton and other companies controlled by him used the jet in furtherance of *their* profit-motivated activities, but

---

[19] In contrast, there is authority (post-*W & W Fertilizer*) for the proposition that the grantor of a grantor trust *is* treated as owning the trust's assets for tax purposes in general.  *See Sun First Nat'l Bank of Orlando v. United States*, 607 F.2d 1347, 1351, 1355 n.11 (Ct. Cl. 1979) (distinguishing *W & W Fertilizer*); *Madorin v. Commissioner*, 84 T.C. 667 (1985); Treas. Reg. § 1.1001-2(c), ex. 5 (1980).

- 43 -

RWB did not. Based in part on cases holding that an individual's profit motive is attributable to his wholly-owned S corporation for purposes of § 183, the court held that, because Morton, RWB, and the other companies operated as a "unified business enterprise," § 183 did not preclude the claimed deductions. Although that holding may support the attribution of taxpayers' respective profit motives to their S-corporation holding companies for purposes of § 183, it does not support their argument that they should be treated as owning the FLPJ shares for purposes of the -2(c)(1) parenthetical after they transferred those shares to their holding companies.[20]

Taxpayers' remaining argument in favor of applying constructive ownership principles in the context of the -2(c)(1) parenthetical is

---

[20] Taxpayers point to language in *Morton* suggesting that the bedrock tax principle of corporate separateness, *see Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943), has less force in the context of S corporations. Suffice it to say that the court's offhand remarks in that regard ("in an S corporation, the corporation is essentially the individual owner(s)," and "[Morton's] entities are 'alter egos' of [Morton] …[because] they all have the same business purpose," 98 Fed. Cl. at 601, 602), unsupported by any citation to authority, are not accurate statements of the law. *See, e.g., Broz v. Commissioner*, 727 F.3d 621, 629-631 (6th Cir. 2013); *Crook v. Commissioner*, 80 T.C. 27, 33 (1983), *aff'd*, 747 F.2d 1463 (5th Cir. 1984).

12208877.1

unpersuasive.  According to taxpayers (Br. 15, 16), given "[t]he Kintner

Regulations' bias towards partnership classification," the CFC's refusal

to read a constructive ownership rule into the -2(c)(1) parenthetical

"thwarts the intent of [those] [r]egulations by allowing taxpayers to

avoid one of the elements favoring partnership classification (a lack of

centralized management) simply by inserting a pass through holding

company between the natural person member and the entity."  Since

the Kintner regulations have been a dead letter for almost 20 years,

taxpayers' concern regarding future manipulation of the regulations is

unfounded.[21]

> **b.    Taxpayers' contention that FLPJ's board of directors did not have exclusive authority to manage FLPJ's affairs is baseless**

Taxpayers' arguments on the "exclusive management authority"

front are largely irrelevant.  For instance, taxpayers begin by asserting

---

[21] The Kintner regulations were replaced by regulations implementing the so-called "check the box" regime effective January 1, 1997.  *See* T.D. 8697, 1997-1 C.B. 215.  Under that regime, a foreign entity – other than certain entity forms that are treated as corporations *per se* – may elect to be treated as a corporation or as a partnership (or, in the case of such an entity with only one member, as a corporation or as a "disregarded entity").  *See* note 4, *supra* p. 7.

- 45 -

(Br. 17) that "[t]he court erred in applying Japanese law," even as they acknowledge (*id*.) that "[t]he court declined to decide whether Arizona law should apply" (*i.e.*, because the court gave full effect to the various agreements between Yamagata and Maughan that purported to supersede Japanese law).[22] They go on to argue for the application of Arizona law based on the choice-of-law provisions contained in their various agreements (*id*. at 19), but then they invoke Japanese law regarding the enforceability of those agreements (*id*. at 19-20). Again, because the CFC gave full effect to the various agreements, the choice-of-law issue is a red herring.

Next, taxpayers erroneously contend (Br. 21) that, because "FLPJ's board was controlled by Maughan and Yamagata" (in that their respective selections accounted for four of the board memberships in the aggregate), "the board's management authority was not exclusive of the members." Taxpayers fail to appreciate that *every* board of directors is

---

[22] Likewise irrelevant is taxpayers' claim (Br. 17-18) that "[c]losely held organizations nominally labeled corporations under U.S. state law often are deemed to be partnerships for purposes of the relationships among the owners and the organization." The cases taxpayers cite in support of that proposition (*id*. at 18 n.8) are state-law cases that have nothing to do with the application of the Kintner regulations.

12208877.1

ultimately controlled by the shareholders in this sense.  If the ability of an entity's owners to elect the members of the entity's foremost management group – a basic feature of the corporate form – were deemed to negate the exclusivity of that group's management authority for these purposes, then no foreign entity in the nature of a corporation could ever possess the corporate characteristic of centralized management under the Kintner regulations.  That Yamagata and Maughan may have controlled FLPJ's board in this sense is therefore irrelevant.  The relevant inquiry is whether the exclusive authority to manage FLPJ's affairs resided in its board of directors, acting in that capacity.  As discussed *supra* at pp. 32-33, the CFC correctly answered that question in the affirmative.[23]

Taxpayers' additional ground for asserting that FLPJ's board of directors did not have exclusive management authority, *viz*., the

---

[23] Although taxpayers suggest (Br. 21-22) that the CFC somehow misconstrued their experts' analysis of Japanese law regarding the fiduciary obligations of board members, they do not cogently explain how that would affect "[t]he bottom line" of "whether the board has exclusive management authority."  *Id*. at 22.  In any event, the court did not, as taxpayers claim (*id*. at 20), "focus[ ] its analysis solely on the fiduciary duties of board members."

- 47 -

allegedly "undisputed fact that representative directors had authority –
exclusive of FLPJ's board – to make management decisions," Br. 23, is
simply wrong.  Representative directors are the functional equivalent of
corporate officers who also serve as board members; they have the
power to act on behalf of the company, but only within the parameters
established by the full board.  Indeed, if Maughan, as a representative
director, had been empowered to act on behalf of FLPJ without board
approval, then the other directors would not have been able to block his
unilateral attempt to terminate the status of Driggs as the fifth director
in June of 1992.  Thus, the court did not, as taxpayers claim (*id*. at 25),
"f[ind] that representative directors had the ability to make
management decisions"; rather, it stated (A5) that they "had the
authority to act, severally, on FLPJ's behalf," *i.e.*, to carry out
management decisions of the board.  Nor did Nakao's initial status as a
representative director "demonstrate that [he] had actual control over
FLPJ decision-making."  Br. 25.[24]  And, although the court noted (A11)

---

[24] Although the court initially appeared to suggest as much (A25-
26), it recognized in a footnote that Nakao could not act independently
of the board.  (A26 n.25.)

- 48 -

that, by resolution, Nakao's limited responsibilities as a representative

director were "delegated to him by" Maughan, it did not, as taxpayers

claim (Br. 25-26), "find[ ] that Maughan" did so "independently of the

board."

Finally, taxpayers' assertion that "[t]he fact that FLPJ's board

made management decisions while the shareholders at their meetings

did not is not dispositive," Br. 23, is based solely on their argument (*id*.)

that "Maughan and Yamagata controlled the board through their

nominee agents." As explained *supra* at pp. 46-47, such control is

irrelevant; the issue is whether the exclusive authority to manage

FLPJ's affairs resided in its board of directors, acting in that capacity.

As the court recognized, the contrast between the matters addressed at

director meetings and the matters addressed at shareholder meetings,

as reflected in the minutes of those meetings, confirms that exclusive

management authority resided in the board.

## B.    FLPJ exhibited the corporate characteristic of limited liability

Under the Kintner regulations, an organization was deemed to

have limited liability "if under local law there [was] no member who

[was] personally liable for the debts of or claims against the

- 49 -

organization." Treas. Reg. § 301.7701-2(d)(1). "Personal liability means that a creditor of an organization may seek personal satisfaction from a member of the organization to the extent that the assets of such organization are insufficient to satisfy the creditor's claim." *Id.*

### 1. FLPJ's shareholders were not personally liable for the debts of, or claims against, FLPJ

The CFC correctly found that FLPJ's shareholders "clear[ly]" were not liable for claims against FLPJ "merely due to their status as shareholders," which is "the essence of limited liability under the Kintner regulations." (A34.) As the court noted, "[u]nder the Japanese Commercial Code, the liability of a shareholder in a [*KK*] is limited to the value at which he has taken his shares." (A34.) Moreover, "plaintiffs' expert conceded that without more, plaintiffs' status as shareholders would be insufficient to render Maughan or Yamagata liable for FLPJ's torts or other debts." (A34.) There can be no dispute that, as a general matter, the shareholders of a *KK* resemble the shareholders of a U.S. corporation in this regard.

The court also correctly rejected taxpayers' expansive reading of the definition of "personal liability" in Treas. Reg. § 301.7701-2(d)(1) as including potential liability in extraordinary circumstances based on

shareholder wrongdoing.  Liability in those circumstances is based on the shareholder's *actions*; it "has nothing to do with his status as a shareholder" as such.  *O'Neill v. United States*, 410 F.2d 888, 898 (6th Cir. 1969) (finding limited liability even though the statute at issue "preserve[d] the personal liability of the professional man in his professional dealings with patients").  As another court observed, the Court in *Morrissey v. Commissioner*, 296 U.S. 344 (1935) – the case the Kintner regulations were largely patterned after – "d[id] not say that shareholders are not personally liable for their acts," but rather that "the corporate form '*permits* the limitation of liability of participants.'" *Kurzner v. United States*, 413 F.2d 97, 104 (5th Cir. 1969) (quoting *Morrissey*, 296 U.S. at 359) (emphasis added).  Thus, the fact that "an active participant cannot claim the same protection as a mere investor" does not vitiate the corporate characteristic of limited liability.  *Id.* Applying these principles, the CFC correctly held that "[t]he fact that plaintiffs could have been liable for certain tax debts under a 'denial of transaction' rule – which is premised on their individual participation in a scheme to defraud the Japanese government of tax revenues –

- 51 -

…d[id] not impair FLPJ's limited liability under Japanese law for the purpose of the Kintner regulations."  (A34-35.)[25]

### 2.    Taxpayers' arguments on appeal are meritless

Taxpayers do not dispute the basic premise that potential liability to an entity's creditors based on member *actions* rather than member *status* – for instance, under the equivalent of a "piercing the corporate veil" theory – does not defeat the corporate characteristic of limited liability.  Nor do they dispute that their alleged potential liability relating to FLPJ's 1991-1996 tax case under the "denial of transactions" rule is, in the CFC's words, "'premised on their individual participation in a scheme to defraud the Japanese government of tax revenues.'"  Br. 28 (quoting A34-35).  Instead, they maintain that their participation in the scheme is irrelevant because "individual participation is not

---

[25] Shareholders of a U.S. corporation can be held liable for the unpaid tax debts of the corporation to the extent corporate assets were transferred to them for less than their fair market value.  *See, e.g.*, *Diebold Foundation, Inc. v. Commissioner,* 736 F.3d 172 (2d Cir. 2013); *Murray v. United States*, 687 F.2d 386 (Ct. Cl. 1982).  That shareholders may be liable as transferees for unpaid taxes of their corporation hardly means that the shareholders do not enjoy limited liability for their corporation's debts.  Indeed, if the contrary were true, no corporation could be regarded as affording limited liability to its shareholders.

*required* for liability to inure" under the denial-of-transactions rule: "an individual need merely benefit from the denied transaction, and nothing more, to be personally liable." *Id.* (emphasis added).

Taxpayers' argument in this regard is undermined by their own explanation of the theory underlying the denial-of-transaction rule: "Under Japan's denial of transaction rule, certain transactions can be re-characterized *because, in small family companies, the members can easily adopt accounting treatments that unduly reduce[ ] their or the company's tax liabilities*." Br. 28 (emphasis added).  It stands to reason that the individuals who are deemed to have benefited from the denied transactions – and are therefore subject to secondary liability – will always include the shareholders who engineered the transactions. Because taxpayers could not have benefited from the recharacterized transactions between FLPJ and AVA unless they had arranged them in the first place, their assertion that their alleged potential liability was "not based on their individual participation in the cause of the liability," *id.* at 29, rings hollow.

Finally, we note that the decision of the National Tax Tribunal on which taxpayers base their claim of potential shareholder liability "does

12208877.1

not explicitly refer to Article 132" of Japan's Corporation Tax Law (the statutory basis of the denial-of-transaction rule at the corporate level). (A1429, A375, A391.)  Moreover, the entire increase in FLPJ's Japanese taxable income resulting from the decision was eliminated by a transfer pricing adjustment agreed upon by the United States and Japan. (A1298-1299, A1325-1326.)  As taxpayers' representatives acknowledged, the transfer pricing adjustment "negated the economic effect of the NTA assessments against FLPJ."  (A1299, A1325-1326.) Thus, any potential shareholder liability here was entirely theoretical.

## C.    FLPJ exhibited the corporate characteristic of free transferability of interests

Under the Kintner regulations, an organization was deemed to have free transferability of interests if "each of its members…ha[d] the power, without the consent of other members, to substitute for themselves in the same organization a person who [was] not a member of the organization."  Treas. Reg. § 301.7701-2(e)(1).  The regulation recognized a "modified form of free transferability" if "each member… [could] transfer his interest" to a third party "after having offered such interest to the other members at its fair market value."  Treas. Reg. § 301.7701-2(e)(2).

12208877.1

### 1.    FLPJ had a modified form of free transferability as contemplated in the regulations

The CFC correctly found that FLPJ "retained a modified form of free transferability of interests during all relevant tax years," since none of the transfer restrictions to which the FLPJ shares were subject – as is relevant here, the requirement of board consent, the right of first refusal, and the buy-back provision applicable to the Yamagata shares – precluded a holder from obtaining fair market value for his shares. (A41.)  In particular, if the board withheld its consent to a proposed transfer, the Japanese Commercial Code provided a mechanism whereby the holder could transfer his shares to a third party at a judicially determined price.  (A44.)  Similarly, the right of first refusal required the non-selling shareholder to match the price and terms that the selling shareholder could obtain from a third party.  And the buy-back provision, while potentially affecting the *value* of the Yamagata shares, did not prevent the holder from realizing that value through either the judicial procedure (if the board withheld its consent) or the right-of-first-refusal procedure.

The court's reasoning on this issue is sound.  First, it correctly found that the judicial procedure in lieu of board consent "guarantees a

12208877.1

sale price that is intended to approximate fair market" (A46) even if, as

taxpayers claimed, "not all Japanese courts use the same method to

determine" that value (A45), since no single valuation method is

appropriate in all instances.  *See United States v. Woods*, 134 S. Ct. 557,

566 (2013) (citing *Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294,

325 (2013), for the proposition that there are multiple approaches for

determining fair market value).  The court also correctly found no

"*meaningful* difference" between the right-of-first-refusal procedure and

the procedure described in Treas. Reg. § 301.7701-2(e)(2), despite

taxpayers' hyper-technical arguments to the contrary.  (A48 [emphasis

added].)  And it correctly recognized that the buy-back provision, rather

than imposing a restriction on transfer of the Yamagata shares, effected

a change in the attributes of ownership of those shares (*i.e.*, from those

associated with outright ownership to those associated with a

terminable interest plus the right to receive a $10 million termination

payment).  Accordingly, "it is the value associated with pre-

[termination] transfers [of those attributes] – not the [amount of the

termination] payment upon [Yamagata's] death – that is relevant for

purposes of the free transferability analysis." (A51.)  Since nothing

- 56 -

would prevent the holder of the Yamagata shares from obtaining the full value of those shares – taking into account their terminable nature and the payoff at termination – by means of either the judicial procedure or the right-of-first-refusal procedure, the court correctly found that the buy-back provision has no effect on that analysis.

## 2.    Taxpayers' arguments on appeal are meritless

Much like their centralized-management argument, taxpayers' free-transferability argument begins (Br. 30) with an irrelevant discussion of whether the right-of-first-refusal procedure and the buy-back provision should be analyzed under Japanese or Arizona law. Just as the court made clear that its centralized-management finding was not dependent on the choice-of-law issue, here, too, it based its finding of free transferability on the "assum[ption] that all of the purported restrictions were fully enforceable under both Arizona and Japanese law." (A41.)

Turning to the requirement of board approval, taxpayers no longer argue (as they did below) that the judicial procedure in lieu of board

consent "[do]es not reliably arrive at a fair market value." (A45.)[26] Instead, they now claim (Br. 31) that "[t]he test is not whether shares subject to a board consent restriction could be transferred at a fair market price" as contemplated in Treas. Reg. § 301.7701-2(e)(2) (pertaining to rights of first refusal), but whether such shares satisfied the free transferability standard of Treas. Reg. § 301.7701-2(e)(1) (*i.e.*, whether they could be transferred without the consent of other members). But even if that were the test, the FLPJ interests satisfied it; by virtue of the judicial procedure in lieu of board consent, they could in fact be transferred without the consent of the other member.

Taxpayers' argument regarding the right-of-first-refusal procedure fares no better. According to taxpayers, that procedure did not satisfy Treas. Reg. § 301.7701-2(e)(2), since the regulation contemplates an offer to the other members at fair market value, whereas the FLPJ procedure could result in an offer to the other

---

[26] Taxpayers' suggestion that the requirement of board consent – sanctioned by the Japanese Commercial Code and contained in FLPJ's Articles of Association – might not be subject to the corresponding judicial procedure set forth in the Commercial Code, Br. 31, is specious, particularly in light of the fact that they acknowledged the applicability of that procedure below. (A1890-1891.)

member at "a price *above fair market value*" (if, for instance, a competitor were willing to pay a premium).  Br. 34 (emphasis added). Taxpayers fail to explain why a right-of-first-refusal procedure that is *less* restrictive than the "safe harbor" procedure contemplated in the regulations – *i.e.*, because it allows a selling FLPJ shareholder to negotiate a premium and then offer the shares to the other shareholder at that enhanced price rather than at the lower fair market value – would nonetheless fail to qualify as a modified form of free transferability.

Taxpayers also misapprehend the effect of the buy-back provision. That provision does not impose a restriction on the transfer of the Yamagata shares upon Yamagata's death; rather, it establishes that there will be nothing left to transfer at that time.  Yamagata traded away outright ownership of the shares, including the power of disposition at death, in exchange for a life estate and payment of $10 million to his successors upon the termination of that interest.  By its very nature, the resulting terminable property interest could only be transferred prior to Yamagata's death, and, as the CFC correctly found,

- 59 -

nothing in the buy-back provision prevented the holder from obtaining full value for that interest upon any such transfer.[27]

Finally, we note that neither the right-of-first-refusal provision nor the buy-back provision is even relevant to the free-transferability analysis for periods prior to October 1992.  As indicated *supra* at pp. 13-14, FLPJ's publicly filed Commercial Registry was never amended to reflect the right of first refusal, and there is no evidence that the FLPJ share certificates bore the required legend providing notice of that restriction at any time prior to the October 23, 1992 transfers of the shares to taxpayers' respective holding companies.  (A2536-2537.) Accordingly, at least until October 23, 1992, the right of first refusal was unenforceable against third parties without actual notice thereof. (A1389-1390.)  And, as taxpayers acknowledge (A49 n.40), the buy-back provision was altogether invalid prior to the substitution of ASI for

---

[27] *Eleanore Builders, Inc. v. United States*, 826 F. Supp. 1111 (N.D. Ohio 1993), which taxpayers cite for the proposition that "the test for free transferability is determined *not* based on the life of the shareholder, but rather on the life of the entity," Br. 35, is wholly inapposite.  The court there merely stated that "[s]hares of the Company's stock were freely transferred throughout the life of the Company." *Id*. at 1115.

12208877.1

FLPJ as the obligor thereunder pursuant to the October 13, 1992 buy-sell agreement.  (A1398-1399.)

## CONCLUSION

The judgment of the Court of Federal Claims is correct and should be affirmed.

Respectfully submitted,

TAMARA W. ASHFORD
 *Acting Assistant Attorney General*

/s/ Arthur T. Catterall

RICHARD FARBER                (202) 514-2959
ARTHUR T. CATTERALL           (202) 514-2937
 *Attorneys*
 *Tax Division*
 *Department of Justice*
 *Post Office Box 502*
 *Washington, D.C. 20044*

DECEMBER 2014

- 61 -

# REGULATORY APPENDIX

## 26 C.F.R. (Treas. Reg.) (1996):

## § 301.7701-1  Classification of organizations for tax purposes.

**(a) Person.**  The term "person" includes an individual, a corporation, a partnership, a trust or estate, a joint-stock company, an association, or a syndicate, group, pool, joint venture, or other unincorporated organization or group.  Such term also includes a guardian, committee, trustee, executor, administrator, trustee in bankruptcy, receiver, assignee for the benefit of creditors, conservator, or any person acting in a fiduciary capacity.

**(b) Standards.**  The Internal Revenue Code prescribes certain categories, or classes, into which various organizations fall for purposes of taxation.  These categories, or classes, include associations (which are taxable as corporations), partnerships, and trusts.  The tests, or standards, which are to be applied in determining the classification in which an organization belongs (whether it is an association, a partnership, a trust, or other taxable entity) are determined under the Internal Revenue Code.  Sections 301.7701-2 to 301.7701-4 set forth these tests, or standards, which are to be applied in determining whether an organization is (1) an association (see § 301.7701-2), (2) a partnership (see § 301.7701-3), or (3) a trust (see § 301.7701-4).

**(c) Effect of local law.**  As indicated in paragraph (b) of this section, the classes into which organizations are to be placed for purposes of taxation are determined under the Internal Revenue Code.  Thus, a particular organization might be classified as a trust under the law of one State and a corporation under the law of another State.  However, for purposes of the Internal Revenue Code, this organization would be uniformly classed as a trust, an association (and therefore, taxable as a corporation), or some other entity, depending upon its nature under the classification standards of the Internal Revenue Code.  Similarly, the term "partnership" is not limited to the common-law meaning of partnership, but is broader in its scope and includes groups not commonly called partnerships.  See § 1.761-1 of this chapter (Income

- 62 -

Tax Regulations) and § 301.7701-3. The term "corporation" is not limited to the artificial entity usually known as a corporation, but includes also an association, a trust classed as an association because of its nature or its activities, a joint-stock company, and an insurance company. Although it is the Internal Revenue Code rather than local law which establishes the tests or standards which will be applied in determining the classification in which an organization belongs, local law governs in determining whether the legal relationships which have been established in the formation of an organization are such that the standards are met. Thus, it is local law which must be applied in determining such matters as the legal relationships of the members of the organization among themselves and with the public at large, and the interests of the members of the organization in its assets.

## § 301.7701-2  Associations.

**(a) Characteristics of corporations. (1)** The term "association" refers to an organization whose characteristics require it to be classified for purposes of taxation as a corporation rather than as another type of organization such as a partnership or a trust. There are a number of major characteristics ordinarily found in a pure corporation which, taken together, distinguish it from other organizations. These are: (i) Associates, (ii) an objective to carry on business and divided the gains therefrom, (iii) continuity of life, (iv) centralization of management, (v) liability for corporate debts limited to corporate property, and (vi) free transferability of interests. Whether a particular organization is to be classified as an association must be determined by taking into account the presence or absence of each of these corporate characteristics. The presence or absence of these characteristics will depend upon the facts in each individual case. In addition to the major characteristics set forth in this subparagraph other factors may be found in some cases which may be significant in classifying an organization as an association, a partnership, or a trust. An organization will be treated as an association if the corporate characteristics are such that the organization more nearly resembles a corporation than a partnership or trust. See *Morrissey et al. v. Commissioner* (1935) 296 U.S. 344.

- 63 -

**(2)** Since associates and an objective to carry on business for joint profit are essential characteristics of all organizations engaged in business for profit (other than the so-called one-man corporation and the sole proprietorship), the absence of either of these essential characteristics will cause an arrangement among co-owners of property for the development of such property for the separate profit of each not to be classified as an association.  Some of the major characteristics of a corporation are common to trusts and corporations, and others are common to partnerships and corporations.  Characteristics common to trusts and corporations are not material in attempting to distinguish between a trust and an association, and characteristics common to partnerships and corporations are not material in attempting to distinguish between an association and a partnership.  For example, since centralization of management, continuity of life, free transferability of interests, and limited liability are generally common to trusts and corporations, the determination of whether a trust which has such characteristics is to be treated for tax purposes as a trust or as an association depends on whether there are associates and an objective to carry on business and divide the gains therefrom.  On the other hand, since associates and an objective to carry on business and divide the gains therefrom are generally common to both corporations and partnerships, the determination of whether an organization which has such characteristics is to be treated for tax purposes as a partnership or as an association depends on whether there exists centralization of management, continuity of life, free transferability of interests, and limited liability.

**(3)** An unincorporated organization shall not be classified as an association unless such organization has more corporate characteristics than noncorporate characteristics.  In determining whether an organization has more corporate characteristics than noncorporate characteristics, all characteristics common to both types of organizations shall not be considered.  For example, if a limited partnership has centralized management and free transferability of interests but lacks continuity of life and limited liability, and if the limited partnership has no other characteristics which are significant in determining its classification, such limited partnership is not classified

as an association. Although the limited partnership also has associates and an objective to carry on business and divide the gains therefrom, these characteristics are not considered because they are common to both corporations and partnerships.

**(4)** The rules of this section and §§ 301.7701-3 and 301.7701-4 are applicable only to taxable years beginning after December 31, 1960. However, for any taxable year beginning after December 31, 1960, but before October 1, 1961, any amendment of the agreement establishing the organization will, in the case of an organization in existence on November 17, 1960, be treated for purposes of determining the classification of the organization as being in effect as of the beginning of such taxable year (i) if the amendment of the agreement is made before October 1, 1961, and (ii) if the amendment results in the classification of the organization under the rules of this section and §§ 301.7701-1, 301.7701-3, and 301.7701-4 in the same manner as the organization was classified for tax purposes on November 17, 1960.

**(5)** All references in this section to the Uniform Limited Partnership Act shall be deemed to refer both to the original Uniform Limited Partnership Act (adopted in 1916) and to the revised Uniform Limited Partnership Act (adopted by the National Conference of Commissioners on Uniform State Laws in 1976).

**(b) Continuity of life. (1)** An organization has continuity of life if the death, insanity, bankruptcy, retirement, resignation, or expulsion of any member will not cause a dissolution of the organization. On the other hand, if the death, insanity, bankruptcy, retirement, resignation, or expulsion of any member will cause a dissolution of the organization, continuity of life does not exist. If the retirement, death, or insanity of a general partner of a limited partnership causes a dissolution of the partnership, unless the remaining general partners agree to continue the partnership or unless all remaining members agree to continue the partnership, continuity of life does not exist. See *Glensder Textile Company* (1942) 46 B.T.A. 176 (A., C.B. 1942-1, 8).

- 65 -

**(2)** For purposes of this paragraph, dissolution of an organization means an alteration of the identity of an organization by reason of a change in the relationship between its members as determined under local law.  For example, since the resignation of a partner from a general partnership destroys the mutual agency which exists between such partner and his copartners and thereby alters the personal relation between the partners which constitutes the identity of the partnership itself, the resignation of a partner dissolves the partnership.  A corporation, however, has a continuing identity which is detached from the relationship between its stockholders.  The death, insanity, or bankruptcy of a shareholder or the sale of a shareholder's interest has no effect upon the identity of the corporation and, therefore, does not work a dissolution of the organization.  An agreement by which an organization is established may provide that the business will be continued by the remaining members in the event of the death or withdrawal of any member, but such agreement does not establish continuity of life if under local law the death or withdrawal of any member causes a dissolution of the organization.  Thus, there may be a dissolution of the organization and no continuity of life although the business is continued by the remaining members.

**(3)** An agreement establishing an organization may provide that the organization is to continue for a stated period or until the completion of a stated undertaking or such agreement may provide for the termination of the organization at will or otherwise.  In determining whether any member has the power of dissolution, it will be necessary to examine the agreement and to ascertain the effect of such agreement under local law.  For example, if the agreement expressly provides that the organization can be terminated by the will of any member, it is clear that the organization lacks continuity of life.  However, if the agreement provides that the organization is to continue for a stated period or until the completion of a stated transaction, the organization has continuity of life if the effect of the agreement is that no member has the power to dissolve the organization in contravention of the agreement. Nevertheless, if, notwithstanding such agreement, any member has the power under local law to dissolve the organization, the organization lacks continuity of life.  Accordingly, a general partnership subject to a

- 66 -

statute corresponding to the Uniform Partnership Act and a limited partnership subject to a statute corresponding to the Uniform Limited Partnership Act both lack continuity of life.

**(c) Centralization of management.  (1)** An organization has centralized management if any person (or any group of persons which does not include all the members) has continuing exclusive authority to make the management decisions necessary to the conduct of the business for which the organization was formed.  Thus, the persons who are vested with such management authority resemble in powers and functions the directors of a statutory corporation.  The effective operation of a business organization composed of many members generally depends upon the centralization in the hands of a few of exclusive authority to make management decisions for the organization, and therefore, centralized management is more likely to be found in such an organization than in a smaller organization.

**(2)** The persons who have such authority may, or may not, be members of the organization and may hold office as a result of a selection by the members from time to time, or may be self-perpetuating in office.  See *Morrissey et al. v. Commissioner* (1935) 296 U.S. 344.  Centralized management can be accomplished by election to office, by proxy appointment, or by any other means which has the effect of concentrating in a management group continuing exclusive authority to make management decisions.

**(3)** Centralized management means a concentration of continuing exclusive authority to make independent business decisions on behalf of the organization which do not require ratification by members of such organization.  Thus, there is not centralized management when the centralized authority is merely to perform ministerial acts as an agent at the direction of a principal.

**(4)** There is no centralization of continuing exclusive authority to make management decisions, unless the managers have sole authority to make such decisions.  For example, in the case of a corporation or a trust, the concentration of management powers in a board of directors

- 67 -

or trustees effectively prevents a stockholder or a trust beneficiary, simply because he is a stockholder or beneficiary, from binding the corporation or the trust by his acts.  However, because of the mutual agency relationship between members of a general partnership subject to a statute corresponding to the Uniform Partnership Act, such a general partnership cannot achieve effective concentration of management powers and, therefore, centralized management.  Usually, the act of any partner within the scope of the partnership business binds all the partners; and even if the partners agree among themselves that the powers of management shall be exclusively in a selected few, this agreement will be ineffective as against an outsider who had no notice of it.  In addition, limited partnerships subject to a statute corresponding to the Uniform Limited Partnership Act, generally do not have centralized management, but centralized management ordinarily does exist in such a limited partnership if substantially all the interests in the partnership are owned by the limited partners.  Furthermore, if all or a specified group of the limited partners may remove a general partner, all the facts and circumstances must be taken into account in determining whether the partnership possesses centralized management.  A substantially restricted right of the limited partners to remove the general partner (e.g., in the event of the general partner's gross negligence, self-dealing, or embezzlement) will not itself cause the partnership to possess centralized management.

**(d) Limited liability.  (1)** An organization has the corporate characteristic of limited liability if under local law there is no member who is personally liable for the debts of or claims against the organization.  Personal liability means that a creditor of an organization may seek personal satisfaction from a member of the organization to the extent that the assets of such organization are insufficient to satisfy the creditor's claim.  A member of the organization who is personally liable for the obligations of the organization may make an agreement under which another person, whether or not a member of the organization, assumes such liability or agrees to indemnify such member for any such liability.  However, if under local law the member remains liable to such creditors notwithstanding such agreement, there exists personal liability with

- 68 -

respect to such member.  In the case of a general partnership subject to a statute corresponding to the Uniform Partnership Act, personal liability exists with respect to each general partner.  Similarly, in the case of a limited partnership subject to a statute corresponding to the Uniform Limited Partnership Act, personal liability exists with respect to each general partner, except as provided in subparagraph (2) of this paragraph (d).

**(2)** In the case of an organization formed as a limited partnership, personal liability does not exist, for purposes of this paragraph, with respect to a general partner when he has no substantial assets (other than his interest in the partnership) which could be reached by a creditor of the organization and when he is merely a "dummy" acting as the agent of the limited partners.  Notwithstanding the formation of the organization as a limited partnership, when the limited partners act as the principals of such general partner, personal liability will exist with respect to such limited partners.  Also, if a corporation is a general partner, personal liability exists with respect to such general partner when the corporation has substantial assets (other than its interest in the partnership) which could be reached by a creditor of the limited partnership.  A general partner may contribute his services, but no capital, to the organization, but if such general partner has substantial assets (other than his interest in the partnership), there exists personal liability.  Furthermore, if the organization is engaged in financial transactions which involve large sums of money, and if the general partners have substantial assets (other than their interests in the partnership), there exists personal liability although the assets of such general partners would be insufficient to satisfy any substantial portion of the obligations of the organization.  In addition, although the general partner has no substantial assets (other than his interest in the partnership), personal liability exists with respect to such general partner when he is not merely a "dummy" acting as the agent of the limited partners.  If the limited partnership agreement provides that a general partner is not personally liable to creditors for the debts of the partnership (other than debts for which another general partner is personally liable), it shall be presumed that personal liability does not

- 69 -

exist with respect to that partner unless it is established that the provision is ineffective under local law.

**(e) Free transferability of interests.  (1)** An organization has the corporate characteristic of free transferability of interests if each of its members or those members owning substantially all of the interests in the organization have the power, without the consent of other members, to substitute for themselves in the same organization a person who is not a member of the organization.  In order for this power of substitution to exist in the corporate sense, the member must be able, without the consent of other members, to confer upon his substitute all the attributes of his interest in the organization.  Thus, the characteristic of free transferability of interests does not exist in a case in which each member can, without the consent of other members, assign only his right to share in profits but cannot so assign his rights to participate in the management of the organization.  Furthermore, although the agreement provides for the transfer of a member's interest, there is no power of substitution and no free transferability of interest if under local law a transfer of a member's interest results in the dissolution of the old organization and the formation of a new organization.

**(2)** If each member of an organization can transfer his interest to a person who is not a member of the organization only after having offered such interest to the other members at its fair market value, it will be recognized that a modified form of free transferability of interests exists.  In determining the classification of an organization, the presence of this modified corporate characteristic will be accorded less significance than if such characteristic were present in an unmodified form.

**(f) Cross reference.**  See paragraph (b) of § 301.7701-3 for the application to limited partnerships of the rules relating to corporate characteristics.

**(g) Examples.**  The application of the rules described in this section may be illustrated by the following examples:

12208877.1

**Example (1).**  [Reserved]

**Example (2).**  A group of seven doctors forms a clinic for the purpose of furnishing, for profit, medical and surgical services to the public.  They each transfer assets to the clinic, and their agreement provides that except upon complete liquidation of the organization on the vote of three-fourths of its members, no member has any individual interest in its assets.  Their agreement also provides that neither the death, insanity, bankruptcy, retirement, resignation, nor expulsion of a member shall cause the dissolution of the organization.  However, under the applicable local law, a member who withdraws does have the power to dissolve the organization.  While the agreement provides that the management of the clinic is to be vested exclusively in an executive committee of four members elected by all the members, this provision is ineffective as against outsiders who had no notice of it; and, therefore, the act of any member within the scope of the organization's business binds the organization insofar as such outsiders are concerned.  While the agreement declares that each individual doctor alone is liable for acts of malpractice, members of the clinic are, nevertheless, personally liable for all debts of the clinic including claims based on malpractice. No member has the right, without the consent of all the other members, to transfer his interest to a doctor who is not a member of the clinic. The organization has associates and an objective to carry on business and divide the gains therefrom.  However, it does not have the corporate characteristics of continuity of life, centralized management, limited liability, and free transferability of interests.  The organization will be classified as a partnership for all purposes of the Internal Revenue Code.

**Example (3).**  A group of 25 lawyers forms an organization for the purpose of furnishing, for profit, legal services to the public.  Their agreement provides that the organization will dissolve upon the death, insanity, bankruptcy, retirement, or expulsion of a member.  While their agreement provides that the management of the organization is to be vested exclusively in an executive committee of five members elected by all the members, this provision is ineffective as against outsiders who had no notice of it; and, therefore, the act of any member within

12208877.1

the scope of the organization's business binds the organization insofar as such outsiders are concerned. Members of the organization are personally liable for all debts, or claims against, the organization. No member has the right, without the consent of all the other members, to transfer his interest to a lawyer who is not a member of the organization. The organization has associates and an objective to carry on business and divide the gains therefrom. However, the four corporate characteristics of limited liability, centralized management, free transferability of interests, and continuity of life are absent in this case. The organization will be classified as a partnership for all purposes of the Internal Revenue Code.

**Example (4).** A group of 25 persons forms an organization for the purpose of engaging in real estate investment activities. Each member has the power to dissolve the organization at any time. The management of the organization is vested exclusively in an executive committee of five members elected by all the members, and under the applicable local law, no one acting without the authority of this committee has the power to bind the organization by his acts. Under the applicable local law, each member is personally liable for the obligations of the organization. Every member has the right to transfer his interest to a person who is not a member of the organization, but he must first advise the organization of the proposed transfer and give it the opportunity on a vote of the majority to purchase the interest at its fair market value. The organization has associates and an objective to carry on business and divide the gains therefrom. While the organization does have the characteristics of centralized management and a modified form of free transferability of interests, it does not have the corporate characteristics of continuity of life and limited liability. Under the circumstances presented, the organization will be classified as a partnership for all purposes of the Internal Revenue Code.

**Example (5).** A group of 25 persons forms an organization for the purpose of engaging in real estate investment activities. Under their agreement, the organization is to have a life of 20 years, and under the applicable local law, no member has the power to dissolve the organization prior to the expiration of that period. The management of

12208877.1

the organization is vested exclusively in an executive committee of five members elected by all the members, and under the applicable local law, no one acting without the authority of this committee has the power to bind the organization by his acts.  Under the applicable local law, each member is personally liable for the obligations of the organization.  Every member has the right to transfer his interest to a person who is not a member of the organization, but he must first advise the organization of the proposed transfer and give it the opportunity on a vote of the majority to purchase the interest at its fair market value.  The organization has associates and an objective to carry on business and divide the gains therefrom.  While the organization does not have the corporate characteristics of limited liability, it does have continuity of life, centralized management, and a modified form of free transferability of interests.  The organization will be classified as an association for all purposes of the Internal Revenue Code.

**Example (6).**  A group of 25 persons forms an organization for purposes of engaging in real estate investment activities.  Each member has the power to dissolve the organization at any time.  The management of the organization is vested exclusively in an executive committee of five members elected by all the members, and under the applicable local law, no one acting without the authority of this committee has the power to bind the organization by his acts.  Under the applicable local law, the liability of each member for the obligations of the organization is limited to paid and subscribed capital.  Every member has the right to transfer his interest to a person who is not a member of the organization, but he must first advise the organization of the proposed transfer and give it the opportunity on a vote of the majority to purchase the interest at its fair market value.  The organization has associates and an objective to carry on business and divide the gains therefrom.  While the organization does not have the characteristic of continuity of life, it does have limited liability, centralized management, and a modified form of free transferability of interests.  The organization will be classified as an association for all purposes of the Internal Revenue Code.

12208877.1

**Example (7).**  A group of 25 persons forms an organization for the purpose of investing in securities so as to educate the members in principles and techniques of investment practices and to share the income from such investments.  While the agreement states that the organization will operate until terminated by a three-fourths vote of the total membership and will not terminate upon the withdrawal or death of any member, under the applicable local law, a member has the power to dissolve the organization at any time.  The business of the organization is carried on by the members at regular monthly meetings and buy or sell action may be taken only when voted by a majority of the organization's membership present.  Elected officers perform only ministerial functions such as presiding at meetings and carrying out the directions of the members.  Members of the organization are personally liable for all debts of, or claims against, the organization.  No member may transfer his membership.  The organization has associates and an objective to carry on business and divide the gains therefrom.  However, the organization does not have the corporate characteristics of limited liability, free transferability of interests, continuity of life, and centralized management.  The organization will be treated as a partnership for all purposes of the Internal Revenue Code.

12208877.1

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on December 18, 2014. Counsel for the appellant are registered ECF users and will be served by the ECF system.

/s/ Arthur T. Catterall
ARTHUR T. CATTERALL
*Attorney*

12208877.1

# CERTIFICATE OF COMPLIANCE

## With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   [X]   this brief contains 11,479 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]   this brief uses a monospaced typeface and contains [*state the number of*]          lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [X]   this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word 2010</u> in <u>14-point Century Schoolbook</u>; *or*

   [ ]   this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


   /s/ Arthur T. Catterall

Attorney for the Appellee

Dated:  December 18, 2014