**2014-5065**

# In The
# United States Court of Appeals
## For The Federal Circuit

## GENE H. YAMAGATA, REX G. MAUGHAN, AND RUTH G. MAUGHAN,

*Plaintiffs – Appellants*,

**v.**

## UNITED STATES,

*Defendant – Appellee.*

**APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS IN NOS. 1:07-CV-00698-NBF AND 1:07-CV-00704-NBF, JUDGE NANCY B. FIRESTONE.**

————————————

## REPLY BRIEF OF APPELLANTS

————————————

Merwin D. Grant
Kenneth B. Vaughn
GRANT & VAUGHN, P.C.
6225 North 24th Street, Suite 125
Phoenix, Arizona  85016
(602) 393-4322 (Telephone)
(602) 393-4327 (Facsimile)
grant@phxlaw.com
vaughn@phxlaw.com

Tim A. Tarter
Philip C. Wilson
Kacie N. C. Dillon
WOOLSTON & TARTER, P.C.
2525 East Arizona Biltmore Circle, Suite B-218
Phoenix, Arizona  85016
(602) 532-9199 (Telephone)
(602) 532-9197 (Facsimile)
tim@woolston-tarter.com
phil@woolston-tarter.com
kacie@woolston-tarter.com

*Counsel for Appellant*
 *Gene H. Yamagata*

*Counsel for Appellants*
 *Rex G. Maughan and*
 *Ruth G. Maughan*

**THE LEX GROUP**DC ♦ 1825 K Street, N.W. ♦ Suite 103 ♦ Washington, D.C.  20006
(202) 955-0001 ♦ (800) 856-4419 ♦ Fax: (202) 955-0022 ♦ www.thelexgroup.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

I.    CENTRALIZED MANAGEMENT ............................................................... 1

    A.    THE COURT CORRECTLY RULED THAT FLPJ LACKED
            CENTRALIZED MANAGEMENT WHEN ALL OF ITS
            MEMBERS SAT ON THE BOARD OF DIRECTORS ...................... 1

    B.    PLAINTIFFS MAUGHAN AND YAMAGATA ARE THE
            OWNERS OF FLPJ FOR ALL THE YEARS AT ISSUE,
            PRECLUDING THE CORPORATE CHARACTERISTIC OF
            CENTRALIZED MANAGEMENT ...................................................... 2

            1.    The existence of wholly-owned S-corporation holding
                    companies does not mean that Maughan and Yamagata
                    were not present on FLPJ's board during the years at
                    issue ............................................................................. 2

            2.    Conclusion ................................................................... 4

    C.    THE BOARD OF DIRECTORS DID NOT HAVE
            EXCLUSIVE MANAGEMENT AUTHORITY ................................. 5

            1.    Representative directors had management authority
                    independent of the board of directors ......................... 5

            2.    FLPJ's management authority was not exclusive of
                    FLPJ's members ......................................................... 8

             3.    Conclusion ................................................................. 10

II.    LIMITED LIABILITY ............................................................................... 11

    A.    FLPJ DID NOT POSSESS LIMITED LIABILITY AS A
            RESULT OF THE DENIAL OF TRANSACTION RULE ............... 11

        1.     FLPJ does not possess limited liability given Plaintiffs'
potential for personal liability as owners of a Dozoku
Kaisha.................................................................................11

        2.     Conclusion .................................................................14

III.   FREE TRANSFERABILITY ........................................................14

    A.    THREE TRANSFER RESTRICTIONS EACH PRECLUDE
THE CORPORATE CHARACTERISTIC OF FREE
TRANSFERABILITY .......................................................14

        1.     The judicial procedure in lieu of board consent does not
result in free transferability for the member trying to
transfer his shares....................................................14

        2.     Modified free transferability is absent ......................................16

        3.     The Transfer at Death Provision is a material restriction
on the transferability of FLPJ shares .......................................17

        4.     Conclusion .................................................................20

CONCLUSION.................................................................................20

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Estate of Gloeckner v. Comm'r,
    152 F.3d 208 (2d Cir. 1998) ...........................................................................18

F.B.I. Farms, Inc. v. Moore,
    798 N.E.2d 440 (Ind. 2003) ....................................................................17, 19

Kurzner v. United States,
    413 F.2d 97 (5th Cir. 1969) ...........................................................................11

Larson v. Comm'r,
    66 T.C. 159 (1976)...........................................................................................7

Madorin v. Comm'r,
    84 T.C. 667 (1985)......................................................................................3, 4

Morrissey v. Comm'r,
    296 U.S. 344 (1935)........................................................................................11

Morton v. United States,
    98 Fed. Cl. 596 (2011)...............................................................................2, 3, 4

Shackleford v. United States,
    262 F.3d 1028 (9th Cir. 2001) .......................................................................19

Trust Services of Am., Inc. v. United States,
    885 F.2d 561 (9th Cir. 1989) .........................................................................18

United States v. Prudential Ins. Co. of Am.,
    461 F.2d 208 (5th Cir. 1972) ...........................................................................7

W & W Fertilizer Corp. v. United States,
    527 F.2d 621 (Ct. Cl. 1975)........................................................................2, 3

Wilson v. Comm'r,
        560 F.2d 687 (5th Cir. 1977) ............................................................................3

## STATUTES

26 U.S.C. § 1361 ............................................................................................2

National Tax Collections Act, Chapter III, Article 36.......................................12, 13

## REGULATIONS

Treas. Reg. § 301.7701-2(c)(1) .......................................................................1

Treas. Reg. § 301.7701-2(c)(3) .......................................................................5

Treas. Reg. § 301.7701-2(c)(4) .......................................................................8

Treas. Reg. § 301.7701-2(d)(1).......................................................................13

Treas. Reg. § 301.7701-2(e) ...........................................................................15

Treas. Reg. § 301.7701-2(e)(2)........................................................................16

## OTHER AUTHORITIES

First Joint Statement of Japanese Law, Ex. 18B, Hitoshi Maeda,
Corporate Law (6th ed. 1999) ..........................................................................6

Subchapter S Revision Act of 1982,
Pub. L. No. 97–354, 96 Stat. 1669 (1982) ........................................................2

I.     **CENTRALIZED MANAGEMENT**

    A.     **THE COURT CORRECTLY RULED THAT FLPJ LACKED CENTRALIZED MANAGEMENT WHEN ALL OF ITS MEMBERS SAT ON THE BOARD OF DIRECTORS**

Defendant attempts to insert ambiguity into Treas. Reg. § 301.7701-2(c)(1) by arguing that this Court should look beyond the plain language of the regulation and consider "context."    However, the court correctly found the plain language of the regulation is unambiguous.  This Court should not look beyond the plain language to create ambiguity where none exists.

Paragraph 1 clearly states that centralized management will not obtain when all of an entity's members are present in the management group.  Paragraph 2 does not create ambiguity; read together with paragraph 1, it merely states that those in the management group may consist of some of the members, none of the members or a combination of the two.  Similarly, paragraph 3 does not create ambiguity; rather, it reinforces paragraph 1.  Paragraph 3 states that centralized management will not exist where ratification by the members is needed for business decisions. Where all the members are present in the management group, it is more likely that their ratification will be needed to approve a decision.  Finally, paragraph 4 does not present any ambiguity with the parenthetical language of paragraph 1. Paragraph 4 speaks in terms of stockholders or trust beneficiaries acting in their

individual capacities as such; nothing in that language conflicts with the language

of paragraph 1 regarding all members being present in the management group.

**B.     PLAINTIFFS MAUGHAN AND YAMAGATA ARE THE OWNERS OF FLPJ FOR ALL THE YEARS AT ISSUE, PRECLUDING THE CORPORATE CHARACTERISTIC OF CENTRALIZED MANAGEMENT**

**1.     The existence of wholly-owned S-corporation holding companies does not mean that Maughan and Yamagata were not present on FLPJ's board during the years at issue.**

Defendant dismisses Morton v. United States, 98 Fed. Cl. 596 (2011), citing

W & W Fertilizer Corp. v. United States, 527 F.2d 621 (Ct. Cl. 1975), for the

proposition that it refused to treat the grantor of a grantor trust as the owner of

shares in an S-corporation.  Def. Br. 43.  However, Defendant acknowledges that

subsequent authority holds that a grantor of a grantor trust "*is* treated as owning the

trust's assets for tax purposes in general." Def. Br. 43, n.19.  Defendant fails to

mention that W & W Fertilizer was decided before the Subchapter S Revision Act

of 1982, Pub. L. No. 97–354, 96 Stat. 1669 (1982), which added § 1361 redefining

an S-corporation. § 2, 96 Stat. 1669 (1982). The amendment expressly allowed

grantor trusts to be S-corporation shareholders, thereby abrogating W & W

Fertilizer on that issue.  As applicable in the years in suit here, the formal

ownership of an interest in FLPJ by an S-corporation should not override the

economic substance principle that S-corporations and their owners are largely indistinguishable for tax purposes.  See Morton.

Defendant does not mention Wilson v. Commissioner, 560 F.2d 687 (5th Cir. 1977), which distinguished W & W Fertilizer.  Wilson addressed the issue of who was an S-corporation shareholder for the purpose of consenting to S-corporation treatment – the beneficial owner or the record owner of the share.  560 F.2d at 687. The court held the beneficial owner was the only person required for valid consent to S-corporation status.  Wilson explained that W & W Fertilizer "dealt with a different issue: the definition of shareholder for purposes of the rule that a subchapter S-corporation can have no shareholders other than individuals. The requirements that shareholders be individuals and that they give their consent serve distinct purposes; *the definitions of shareholder need not be the same*. A conclusion that formal ownership governs the W & W Fertilizer issue therefore would not be inconsistent with the well established rule that beneficial ownership determines who must consent to the subchapter S election." Id. at 689, n.9 (emphasis added).

Defendant cites Madorin v. Commissioner, 84 T.C. 667 (1985), (Def. Br. at 43, n.19), but omits to mention that the court distinguished W & W Fertilizer, concluding

> that W & W Fertilizer Corp. has limited applicability. It is an
> exceptional example where form of ownership controls in order that

3

> congressional intent be carried out. We are not concerned in the
> instant case with a statute that requires that a specific form be
> satisfied. Moreover, the effect of the decision in W & W Fertilizer
> Corp. is not that the grantor is not considered the owner of the trust
> corpus for other tax purposes but that there is a disqualification from a
> benefit that was not intended to be bestowed upon a particular form of
> ownership.

84 T.C. at 674. Madorin does not support the contention that Plaintiffs' indirect

ownership of FLPJ through single purpose, pass through holding companies

precludes a finding that Maughan and Yamagata were on FLPJ's board for all

years in suit. Instead, Madorin supports Plaintiffs' position that the owners of a

pass through entity should be considered the owners of the entity's assets for tax

purposes.

Morton is a common-sense economic substance over form analysis of pass

through entities for tax purposes, including S-corporations. In substance, Maughan

and Yamagata as natural persons were both members of FLPJ and both sat on the

board for all years in suit. The court's finding that FLPJ lacked the characteristic

of centralized management until October 23, 1992, should be applied to all years in

suit.

## 2.    Conclusion.

Maughan and Yamagata's decision to place their shares in wholly-owned S-

corporation holding companies did not deprive them of their ownership interest in

FLPJ. They remained FLPJ's only two members and were present on FLPJ's

board of directors at all relevant times.  Under the court's plain (and correct)

reading of the parenthetical language in this portion of the Kintner Regulations,

FLPJ did not possess centralized management for any portion of the years in suit.

## C.    THE BOARD OF DIRECTORS DID NOT HAVE EXCLUSIVE MANAGEMENT AUTHORITY

"Centralized management means a concentration of continuing *exclusive*

authority to make independent business decisions on behalf of the organization

which do not require ratification by members of such organization."  Treas. Reg.

§ 301.7701-2(c)(3) (emphasis added).  The management authority of FLPJ's board

was neither exclusive of its representative directors, nor exclusive of its owners.

### 1.    Representative directors had management authority independent of the board of directors.

The court wrongly granted summary judgment to Defendant on the

centralized management issue while at the same time finding that representative

directors had the ability to act independently of the board of directors.  A5.  Where

the representative directors can act independently of the board, the board's

management authority cannot be exclusive.

Citing no supporting authority, Defendant misstates the role of representative

directors, analogizing them to little more than corporate officers.  Def. Br. 48.

Representative directors are authorized to make significant business decisions,

including binding FLPJ to agreements, commencing lawsuits on FLPJ's behalf, and

binding the company to a loan.  A542.[1]  As stated in the parties' First Joint

Statement of Japanese Law, representative directors have "the authority to take all

necessary actions in courts or outside the courts regarding the company

management" and "company management actions are … undoubtedly identified

as … absolute business actions or … actions for business management purposes…"

and that "… the authority [of the representative director] … is all inclusive."  Id.  In

keeping with this authority the court explicitly found that, as representative

directors, Nakao and Maughan had control over FLPJ decision making.  A5, 25-26.

Defendant's own expert acknowledged that representative directors, such as

Maughan and Nakao, can bind the organization.  A1355-56, 1361.  Defendant's

expert also recognized that Maughan by himself, apart from the board of directors,

"had unlimited authority" to make decisions on FLPJ's behalf and bind FLPJ, and

to direct Nakao to do so.  A1361.  Plaintiffs and Defendant agree that

representative directors had the authority to act, severally, on FLPJ's behalf.

A2533-34.  Indeed, Yamagata was removed as a representative director as part of

the Settlement Agreement ("SA") for this very reason – to prevent him,

independently of the board of directors, from binding FLPJ.  A2534.  The court's

finding that the representative directors could act independently is abundantly

supported by the record.

---

[1] First Joint Statement of Japanese Law, Ex. 18B, Hitoshi Maeda, Corporate Law
385 (6th ed. 1999).

In light of the court's finding that representative directors can bind FLPJ, Defendant's reliance on footnote 26 of the court's opinion is misguided, and the thrust of the discussion in the footnote – that Maughan and Yamagata could not act independently of the board *in their role* as *owners* – is irrelevant.  A26.  While the court acknowledged that Maughan and Yamagata in their role as shareholders could not (without more) bind FLPJ, that conclusion has no bearing on whether FLPJ was centrally managed.  That conclusion does not contradict the court's finding that representative directors have the power to act independently of the board – a finding that negates exclusivity of the board of directors' management authority.  The court pointed out that a quintessential trait distinguishing partnerships from corporations is the ability of an owner to bind a business entity by virtue of his ownership interest.  Id.  While this may be correct as an abstract proposition, it is not the test for centralized management under the Kintner Regulations.  The court's task "is to apply the provisions of respondent's regulations as we find them and not as we think they might or ought to have been written." Larson v. Comm'r, 66 T.C. 159, 185-86 (1976).  A taxpayer "is entitled to have the statute applied as it was written, not as it could have been or should have been written, nor even as Congress might have intended to write it." United States v. Prudential Ins. Co. of Am., 461 F.2d 208, 210 (5th Cir. 1972).  The test is solely whether management authority is centralized exclusively in a singular group

of persons.  Treas. Reg. § 301.7701-2(c)(4) ("There is no [centralization of management] *unless* the managers have *sole* authority to make such decisions.") (emphasis added).  It therefore matters not whether the persons outside the management group are acting in their capacity as owners; it is enough that, as here, the court found that someone outside of FLPJ's board of directors also has management authority in order to render the board's authority non-exclusive under the regulation.

### 2.    FLPJ's management authority was not exclusive of FLPJ's members.

In addition to the lack of exclusive management authority resulting from the role of representative directors, Maughan and Yamagata's control over FLPJ's board also precludes the exclusivity of the board's management authority.

As an initial matter, the court acknowledged that Maughan, Yamagata and others had actual control over FLPJ decision making.  In relevant part, the court stated: "… Maughan and Yamagata were not the only persons with actual control over FLPJ decision-making."  A25.  In making this statement, the court explicitly acknowledged Maughan and Yamagata's control over FLPJ decision making. Therefore, the board of directors' decision making cannot possibly be construed as independent of the FLPJ's owners.  On this basis alone, a finding that FLPJ possessed centralized management was erroneous.

8

Notwithstanding the above, Defendant attempts to analogize FLPJ's board of directors to that of a typical corporation. This is overly simplistic. The structure of FLPJ's ownership and management is quite different from that of a typical corporation. In a typical corporation, directors who make decisions with which the shareholders do not agree can be replaced by the shareholders at a subsequently held shareholders' meeting. The shareholders' control over the board of directors is thus limited in so far as they can only react to actions and decisions of the board, rather than control and direct it in the present.

FLPJ's membership (either direct or indirect) was limited to just two individuals, Maughan and Yamagata. A2537. Maughan and Yamagata ensured that they controlled FLPJ's board at all times. A841. They achieved this by establishing what effectively amounted to valid voting agreements, as fully described in Plaintiffs' opening brief. Pls.' Br. 20-21. Maughan testified that this arrangement allowed him and Yamagata to control FLPJ's decision making process. A1924. In light of Maughan and Yamagata's control over the board, it did not have exclusive management authority.

Defendant argues that Maughan's inability to unilaterally remove one of the directors from FLPJ's board of directors demonstrates the parties' intent to divest themselves of management authority in favor of the board. This is a disputed material fact that the court relied upon to grant summary judgment. That was

9

wrong.  Maughan and Yamagata's control over FLPJ's board is further evidenced by their agreement to approve, as board members, each other's nomination of a nominee director, and to consent to and seat the nominee directors via a Consent in Lieu of Shareholder Meeting.  A844.  Rather than concentrating management authority in the board, these provisions highlight the fact that Maughan and Yamagata preserved their control over FLPJ, and established a mechanism to ensure parity of power between them in respect to this important aspect of FLPJ. The SA provides a mechanism whereby Maughan and Yamagata could select a mutually agreeable fifth board member, not to divest themselves of this authority that they preserved, but as an expeditious means of breaking a tie when their shared and equal authority resulted in a deadlock.  See footnote 4.  A841-42.

### 3.    Conclusion.

The evidence in the record proves that Maughan and Yamagata effectively retained management authority over FLPJ, or at the very least, creates a genuine dispute as to this material issue that should have been resolved at trial.  FLPJ's board did not make decisions independently of the two members.  To rule in Defendant's favor, the court had to find that there was no genuine dispute as to whether FLPJ's board acted independently of the two members.  The court clearly erred in doing so.

## II.    LIMITED LIABILITY

### A.    FLPJ DID NOT POSSESS LIMITED LIABILITY AS A RESULT OF THE DENIAL OF TRANSACTION RULE

#### 1.    FLPJ does not possess limited liability given Plaintiffs' potential for personal liability as owners of a Dozoku Kaisha.

As a basis for concluding that FLPJ possesses limited liability, the court and Defendant focus on Maughan and Yamagata's status as owners of a KK, and the similarity between such owners and shareholders of a U.S. corporation. A35-36; Def. Br. 50.  Indeed, the court's sole reference to FLPJ's status as a Dozoku Kaisha ("DK") appears in a footnote to its findings of fact.  A4.  Defendant emphasizes the court's reliance on Kurzner v. United States, 413 F.2d 97 (5th Cir. 1969), and Morrissey v. Commissioner, 296 U.S. 344 (1935), for the principle that the corporate characteristic of limited liability is not vitiated when an active participant cannot claim the same protection as a mere investor.  Def. Br. 51.  This reasoning equates liability under the Japanese denial of transaction rule to liability under the U.S. corporate liability doctrine of piercing the corporate veil.  See A35-6.

Contrary to Defendant's assertion, (Def. Br. 52), Plaintiffs do not agree with the court that the potential for liability under the denial of transaction rule is "premised on their individual participation in a scheme to defraud the Japanese government of tax revenues."  Reading the entire paragraph from Plaintiffs' brief cited to by Defendant, it is clear that Plaintiffs contend that "the court erred …

11

[and] fundamentally misunderstood Japanese law." Plaintiffs clearly spelled out the Japanese law of denial of transactions, which merely requires individuals to benefit from a denied or recharacterized transaction for personal liability to attach. Pls.' Br. 27-28.[2]

Plaintiffs are not merely owners of a KK; FLPJ is also a DK. A4. As owners of a DK, Maughan and Yamagata are potentially personally liable for certain debts of FLPJ. Under the denial of transaction rule, an owner who takes no part in the decisions or actions that give rise to the liability can be held liable merely because he benefited. Pls.' Br. 28, citing NTCA Article 36. A421-22. Defendant is wrong to state that "… the individuals who are deemed to have benefited from the denied transactions … will always include the shareholders who engineered the transactions" and "… taxpayers could not have benefited from the recharacterized transactions … unless they had arranged them in the first place…" Def. Br. 53. It is possible that a shareholder who "engineered" a particular transaction might not benefit from it while others do. It is also possible that shareholders might benefit from an action taken by another shareholder even though they play no role in the underlying transaction.

---

[2] The Japanese law of denial of transactions results from an interplay between various statutes under the Japanese Corporation Tax Law, National Tax Collection Act ("NTCA") and Income Tax Law. See Pls.' Br. 27-28 and parts of the record cited therein for a full description.

Furthermore, as owners of a DK, Maughan and Yamagata are potentially liable for an amount beyond the value at which they have taken their shares. This is contrary to the court's understanding, as noted by Defendant. Def. Br. 50. Under the denial of transaction rule, Maughan and Yamagata were potentially liable to the extent of the benefits they derived from the denied transactions. A421-22.[3] The value of Maughan and Yamagata's investment in FLPJ and legal reserves in 1996 was $114,911. Obviously, given the amount of FLPJ's assets ($106 million in 1996) (A2479), Maughan and Yamagata could have benefitted from an improper accounting treatment well beyond this amount. Indeed, the amount of the liability that the NTA attempted to assess for having taken improper accounting treatments exceeded $70 million, and at that time, FLPJ's liabilities exceeded its assets by $19 million. A2479. Clearly, Maughan and Yamagata were potentially liable for an amount far in excess of their investment in FLPJ.

Defendant's final note, (Def. Br. 53-54), that the decision of the Japanese National Tax Tribunal did not explicitly refer to the denial of transaction statutes and that the increase in Japanese tax was later eliminated by a transfer pricing adjustment is irrelevant. The test is not whether Plaintiffs actually suffered personal liability as a result of a denied transaction; the test is whether, under local law, they could have. Treas. Reg. § 301.7701-2(d)(1). All that is needed to

---

[3] NTCA Article 36, § 3.

eliminate the characteristic of limited liability is a body of law which could, under the right circumstances, result in personal liability. The Japanese legal system has such a rule – the denial of transaction rule. The regulation speaks in terms of potential or hypothetical liability. That is all that is needed, regardless of whether the facts to support actual liability exist or not.

### 2. Conclusion.

In summary, where an owner who benefits from a transaction that is later denied or recharacterized can be liable beyond the value of his interest in the entity, the corporate characteristic of limited liability cannot exist. Maughan and Yamagata happened to be personally involved in this case, but under Japanese law they would have been liable merely by virtue of being owners of a DK because they would have benefited from the denied transaction. Nothing more is needed under the Kintner Regulations for limited liability to be vitiated.

## III. FREE TRANSFERABILITY

### A. THREE TRANSFER RESTRICTIONS EACH PRECLUDE THE CORPORATE CHARACTERISTIC OF FREE TRANSFERABILITY

#### 1. The judicial procedure in lieu of board consent does not result in free transferability for the member trying to transfer his shares.

The court and Defendant discuss the impact of transfers at fair market value and the resulting modified form of free transferability in the context of the board

consent restrictions.  This is irrelevant given that board consent restrictions are governed by section 1 of Treas. Reg. § 301.7701-2(e), and the modified form of free transferability provision is limited to right of first refusal restrictions under section 2 of the regulation.

One of Defendant's arguments is on point, yet it still fails.  Defendant argues that because a board that refuses to consent to a transfer of one of the member's shares to a transferee of his choice has to select an alternate transferee, and because a Japanese judicial mechanism is available to enforce the transfer to the designated transferee, free transferability exists.

Defendant's argument fails to recognize however, that under this system, the member who seeks to transfer his shares is not free to do so to any transferee of his choice at a price negotiated between them.  Instead, the transferor is forced to sell his shares to an alternate transferee of the company's choosing, and the price may be established by a Japanese court.  Shares that are ultimately transferable are not *ipso facto* freely transferable.  While FLPJ's board has to select an alternate transferee if it refuses to consent to the transfer of shares to the transferor's chosen transferee, this does not eliminate FLPJ's board's discretion to refuse consent to the transfer initially proposed by the transferor member.

Japanese law allows boards of directors broad discretion in refusing to consent to a transfer of shares proposed by a member, while simultaneously

15

providing a process whereby a transfer can still be effected, albeit to a transferee of the board's choice.  Contrary to Defendant's assertion, the latter does not preclude the former.

### 2.    Modified free transferability is absent.

Defendant does not substantively address Plaintiffs' argument that the Kintner Regulations recognize a modified form of free transferability in the single circumstance where the transfer of a member's interest to a non-member is permitted "only after having offered such interest to the other members at its fair market value."  Treas. Reg. § 301.7701-2(e)(2).  Nor does Defendant explain how the procedures in Article 4 of the SA equate with the Kintner Regulations' formulation of modified free transferability.  Instead, Defendant argues that Plaintiffs do not explain why the procedures in the SA would nonetheless fail to qualify as modified free transferability.  Def. Br. 59.

The regulation must be applied as written.  As explained in Plaintiffs' opening brief, the members' interests in FLPJ did not have the characteristic of modified free transferability within the meaning of the Kintner Regulations because there is no requirement to first offer the interest to the other member *at a fair market value* before transferring the interest to a non-member.  Pls.' Br. 33-35.  Either Plaintiff could have offered his shares to the other at an inflated price in an attempt to coerce the other to avoid taking on an undesirable new partner.  If the

SA had contained a requirement that the offer must be at fair market value, or included a required valuation method that would necessarily result in a fair market value, then modified free transferability would exist.  And that is the meaningful difference from what is described in the regulations.  The regulations could have allowed offers at prices other than fair market value to be recognized as modified free transferability, but they did not.  The characteristic of modified free transferability contemplated in the regulations is absent; the court erred in ruling otherwise.

### 3.    The Transfer at Death Provision is a material restriction on the transferability of FLPJ shares.

The court concluded, and Defendant argues, that Yamagata's obligation to sell his interest for a fixed, non-fair market value price at his death was not a restriction on transferability at all because he could transfer the interest at the diminished value. That analysis overlooks the fundamental nature of restrictions on transfer.

Courts routinely treat buy-sell agreements that require transfer to a limited group and fix the price of stock in a closely held corporation for what they are – restrictions on transfer of the stock – as distinguished from stock that is freely transferrable. E.g., F.B.I. Farms, Inc. v. Moore, 798 N.E.2d 440, 445 (Ind. 2003) ("At common law, any restriction on the power to alienate personal property was impermissible. Despite this doctrine, Indiana, like virtually all jurisdictions, allows

corporations and their shareholders to impose restrictions on transfers of shares.");
Estate of Gloeckner v. Comm'r, 152 F.3d 208, 212 (2d Cir. 1998) ("We have long
recognized that for estate tax purposes, parties may also fix the value of closely-
held stock in a *restrictive* buy-sell or redemption agreement.") (emphasis added);
Trust Services of Am., Inc. v. United States, 885 F.2d 561, 569 (9th Cir. 1989)
(discount may be necessary to accurately value stock subject to resale restrictions).

The restriction here is a mandatory obligation restricting to whom
Yamagata's interest may be transferred and setting a fixed, restricted price
regardless of the unrestricted interest's fair market value.  These requirements are
to be measured against free alienability. The court correctly concluded that $10
million was not a fair market value.  A51.  The court also correctly concluded that
"the measure of modified transferability is . . . a transfer price that is at least
substantially similar to fair market value."  A51.  The court erred by then
purporting to apply the restrictions to Yamagata's interest and essentially conclude
that since he could theoretically transfer the diminished interest for a fraction of its
unrestricted value, the restrictions somehow disappeared.

Defendant argues that Yamagata traded away his ownership interest in FLPJ
in exchange for a life estate and payment of $10 million upon termination of that
interest. Def. Br. 59.  Were that analysis correct, then in every case where a

restriction on the transfer of stock exists the owner has traded ownership for something less than ownership.  Defendant cites no authority for that proposition.

Fundamentally, the very purpose of restraints on alienation or restrictions on transfer of stock is to limit the right to transfer to an outsider and to discourage such transfers to the extent allowed by law.  Such restrictions make the interest less attractive than it would be without the restrictions.  See Shackleford v. United States, 262 F.3d 1028, 1032 (9th Cir. 2001) ("It is axiomatic that if an asset's marketability is restricted, it is less valuable than an identical marketable asset. We have long recognized that restrictions on alienability reduce value.") (citations omitted). As the court in F.B.I. Farms recognized, such a restriction "permit[s] owners of a corporation to control its ownership and management and prevent others from inserting themselves into the operation of the corporation."  798 N.E.2d at 445.  The restrictions do not evaporate merely because they diminish the value of the restricted stock and the stock may be transferred at that diminished value.  The court's ruling conflates the Transfer at Death Provision and its terms with the question of whether Yamagata's interest is freely transferrable.  In effect, the court ruled that because the interest – as restricted – could have been transferred – as restricted – there was no substantial restriction on transfer.  The Kintner Regulations do not support that result.

19

### 4.    Conclusion.

Free transferability cannot exist where a member cannot transfer his shares to a transferee of his choosing at a price of his choosing, and modified free transferability cannot exist where there is no mechanism in place to provide for a right of first refusal at a fair market value.  Furthermore, free transferability is absent where substantial restrictions diminish the value of a member's shares during his life, and control the transfer of his shares upon his death.  For these reasons, the corporate characteristic of free transferability is lacking in this case.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request this Court to enter an order (1) reversing the Judgment and remanding with instructions to enter summary judgment in favor of Plaintiffs; and (2) granting such other, further or different relief as the Court finds appropriate.

Respectfully submitted,

/s/ Tim A. Tarter
Tim A. Tarter
Philip C. Wilson
Kacie N. C. Dillon
WOOLSTON & TARTER, P.C.
2525 East Arizona Biltmore Circle, Suite B-218
Phoenix, Arizona  85016
(602) 532-9199 (Telephone)
(602) 532-9197 (Facsimile)
tim@woolston-tarter.com
phil@woolston-tarter.com
kacie@woolston-tarter.com

*Counsel for Appellants*
  *Rex G. Maughan and Ruth G. Maughan*

Merwin D. Grant
Kenneth B. Vaughn
GRANT & VAUGHN, P.C.
6225 North 24th Street, Suite 125
Phoenix, Arizona  85016
(602) 393-4322 (Telephone)
(602) 393-4327 (Facsimile)
grant@phxlaw.com
vaughn@phxlaw.com

*Counsel for Appellant*
  *Gene H. Yamagata*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 20th day of February, 2015, I caused this Reply Brief of Appellants to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Arthur T. Catterall
> Richard Farber
> DEPARTMENT OF JUSTICE TAX DIVISION
> Post Office Box 502
> Ben Franklin Station
> Washington, DC  20044
> (202) 514-2937
>
> *Counsel for Appellee*

Upon acceptance by the Clerk of the Court of the electronically filed document, the required number of copies of the Reply Brief of Appellants will be hand filed at the Office of the Clerk, United States Court of Appeals for the Federal Circuit in accordance with the Federal Circuit Rules.

/s/ Philip C. Wilson
*Counsel for Appellants*
*Rex G. Maughan and Ruth G. Maughan*

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*4,625*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: February 20, 2015          /s/ Tim A. Tarter
                                   *Counsel for Appellants*
                                     *Rex G. Maughan and Ruth G. Maughan*